Ronald GASPARINETTI and Policemen's Benevolent Association, Local No. 3, Appellants in No. 76–1605,

v.

Edward KERR, Police Director, City of Newark (on leave) and Anthony Barres, Acting Police Director, City of Newark, Appellants in No. 76–1606.

Nos. 76–1605 and 76–1606.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1977.

Decided Nov. 3, 1977.

As Amended Nov. 21, 1977.

Zazzali & Zazzali, P. A., Newark, N. J., for appellants in No. 76–1605 and cross-appellees in No. 76–1606; Lawrence A. Whipple, Jr., of counsel and on the brief.

Milton A. Buck, Corp. Counsel, Newark, N. J., for appellees in No. 76–1605 and cross-appellants in No. 76–1606; Matthew J. Scola, Asst. Corp. Counsel, on the brief.

## OPINION OF THE COURT

Before ALDISERT, ROSENN and GARTH, Circuit Judges.

GARTH, Circuit Judge.

### I.

On this appeal[1] (and cross-appeal[2]), we are presented with a challenge to five different regulations of the Newark, New Jersey, Police Department. The district court determined that two of the regulations[3] were unconstitutional, and enjoined their enforcement. The remaining three regulations[4] were held to be constitutional.[5] Plaintiffs had attacked the regulations as facially overbroad and vague, and as violative of their first amendment rights (made applicable to the states by the fourteenth amendment), as applied to them. Because we do not entirely agree with the district court's disposition, we affirm in part and reverse in part.

1. No. 76–1605.

2. No. 76–1606.

3. Newark Police Department Rules and Regulations, ch. 3:1.2–5 and ch. 3:1.2–8.

4. *Id.*, chs. 6:7, 6:8 and 5:4.1.

5. There is some procedural ambiguity in this case. The order appealed from is entitled a "*Final* Order Denying and Granting In Part Motion for *Preliminary* Injunction." (Emphasis added.) Appendix at 38a. In it, the district court granted declaratory judgments and permanent injunctions prohibiting the enforcement of chs. 3:1.2–5 & 3:1.2–8. But it denied a motion to enjoin "*pendente lite*" chs. 5:4.1, 6:7, and 6:8. Moreover, in its Opinion, Appendix at 58A–60A, the court discussed the standard relevant to preliminary injunctions. However, in footnote 2 of its Opinion, the district court stated that "counsel . . . have recognized that there is no factual dispute on the issue of facial constitutionality . . . [and that] the court will treat the matter as if cross-motions for summary judgment have been made on this issue." (Appendix at 41A). In light of footnote 2, and the absence of further proofs for submission to the district court (as counsel conceded in argument before this Court) if we remanded, we review the denial of the injunction *pendente lite* as a denial of a permanent injunction.

The district court limited its analysis of the regulations to the question of facial invalidity, and did not pass on the question of constitutionality of the regulations "as applied" to the plaintiffs. Given our disposition of the case, there is no need for us to reach this issue either.

Plaintiffs had initially also sought compensatory and punitive damages, but consented to the dismissal of the damage claims by the district court. Hence, this issue is not before us.

## II.

This dispute arose out of a low income housing (Kawaida Towers) controversy [6] in Newark. The Tactical Force of the Patrol Division of the Newark Police Department, commanded by Inspector Thomas Critchley, was assigned to keep order at the building site. After the Kawaida dispute had largely run its course, Deputy Chief Thomas Henry, head of the Patrol Division, transferred six members of the Tactical Force to a less prestigious unit.

Plaintiff Ronald Gasparinetti is a police officer with the Newark Police Department. At the time of the incident described above, he was President of the Policemen's Benevolent Association (PBA),[7] the collective bargaining agent for the rank and file police officers. After Deputy Chief Henry transferred the six officers, Gasparinetti made several statements in the local press (Appendix at 1A, 3A), in the PBA Newsletter (Appendix at 3A), and in a PBA Union Notice (Appendix at 2A). It is these statements on which this case centers.

Gasparinetti [8] charged that the six officers had been transferred because of pressure on Inspector Critchley by one Leroi Jones (Imamu Amiri Baraka), a black activist leader of the pro-Kawaida forces. Gasparinetti criticized Critchley for succumbing to political pressure and threats, and for operating outside the Department rules and regulations. He stated that Critchley and Henry were out to "break the morale and spirit of the men," and had practiced "deceit and lies" in order to circumvent the collective bargaining agreement. He further asserted that there were "cowards in the superior officers ranks," and that the men hesitated to face criminals when led by leaders like Critchley.

Subsequent to these statements, Inspector George Graf ordered Gasparinetti to make an "Administrative Submission" and an "Administrative Report," in which he was to answer seven questions regarding the "Critchley incident." In response, Gasparinetti sent Graf two letters in which he claimed that he understood the "order" to be merely a request for cooperation, and that in any event his actions were taken in his capacity as union leader, and therefore not subject to investigation by the Department. Approximately five months later, on September 13, 1973, Gasparinetti was formally charged with violations of departmental regulations ch. 3:1.2–5 (Derogatory Reference),[9] ch. 3:1.2–8 (Censuring Official Transactions),[10] ch. 6:7 (Public Disparagement),[11] ch. 5:4.1 (Obedience to Orders),[12]

6. A low income housing project, the Kawaida Tower Housing Complex, was proposed for construction in Newark's predominantly white North Ward. The proposed construction engendered strong, at times violent, community opposition. Emotions ran high on both sides, and there were several clashes between proponents and opponents. There was also picketing around the building site. The role of the Newark Police in the affair was criticized by both sides.

7. The PBA is the other plaintiff in this case. It was held to have standing by the district court, and that holding has not been challenged on this appeal.

8. Gasparinetti himself was not a member of the Tactical Force; did not report to any of the officers in charge of the Kawaida operation, the Tactical Force, or the Patrol Division; and was not involved, as a police officer, in the Kawaida controversy.

9. One count: his statement that the six officers were transferred after pressure on Critchley by Leroi Jones.

10. Three counts: (1) his statement that the six officers were transferred after pressure by Leroi Jones; (2) his statement that Critchley was assigned to head the Tactical Force in order to break the spirit and morale of the men; and (3) his statement that Critchley and Henry used deceit and lies to circumvent the union contract.

11. Five counts: (1) and (2) were the same as counts 1 and 2 under ch. 3:1.2–8 (note 10 *supra*); (3) his statement that Critchley succumbed to political pressure and operated outside the Department's rules and regulations; (4) his statement that the men hesitate to face criminals when led by superiors like Critchley; and (5) his statement that there were cowards in the superior officers' ranks.

12. Two counts: (1) Gasparinetti failed to submit the requested "Administrative Submission"; and (2) failed to submit an "Administrative Report."

and ch. 6:8 (Acts of Insubordination).[13]

Gasparinetti then filed a complaint, subsequently amended to include the PBA as a plaintiff, against the Newark Police Director, asserting claims under 42 U.S.C. §§ 1983 and 1985, and sought damages and declaratory and injunctive relief. Subsequently he moved for a preliminary injunction. The district court entered its order and opinion on March 2, 1976. The court enjoined the enforcement of chs. 3:1.2–5 and 3:1.2–8, but refused to enjoin the enforcement of chs. 5:4.1, 6:7, and 6:8. (*See* note 5 *supra*.) It stayed pending appeal the enforcement of the latter three sections. This appeal and cross-appeal followed.

## III.

### CHAPTERS 3:1.2–5 AND 3:1.2–8

■ The district court held that the regulations ch. 3:1.2–5 (Derogatory Reference) and ch. 3:1.2–8 (Censuring Official Transactions) were facially overbroad, resulted in a chilling of first amendment rights, and therefore were invalid under the fourteenth amendment. These regulations provide:

Chapter 3:1.2–5 DEROGATORY REFERENCE—

Police Officers and civilian employees shall not by manner, gesture, or speech criticize or make derogatory reference to Department orders or instructions either to the public or to the members of the Department.

. . . . .

Chapter 3:1.2–8 CENSURING OFFICIAL TRANSACTION—

Unless in accord with official duties, police officers and civilian employees shall not, either in writing or discussion, censure other Department members concerning official transactions within the Department.

For substantially the same reasons as are expressed in the district court's opinion (Appendix at 38A), we agree with the dis-

trict court that these two regulations are unconstitutional, and their enforcement must be permanently enjoined.

## IV.

### CHAPTER 6:7

■ The district court also held that regulation ch. 6:7 (Public Disparagement) was not unconstitutionally overbroad and vague.[14] That section reads:

Chapter 6:7 PUBLIC DISPARAGEMENT—

Department members shall not publicly disparage or comment unfavorably or disrespectfully on the official action of a superior officer, nor on the Rules, Regulations, Procedures or Orders of the Police Department.

The district court was of the opinion that ch. 6:7 did not sweep "too broadly in effectuating the legitimate scope of governmental activity," *viz.* the maintenance of public confidence in the police department, since the regulations were directed only at a policeman's *public* speech. *See* District Court Opinion at 15, Appendix at 54A. We disagree.

### A.

■ "A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 432–33, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Since there is a great danger that the exercise of first amendment rights will be chilled by penalties on speech, *see Keyeshian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), the regulation must be in "terms susceptible of objective measurement," *Cramp v. Board of Public Instruction*, 368

---

**13.** Two counts: These are the same as the counts under ch. 5:4.1 (*see* note 12 *supra*).

**14.** Since we dispose of this issue on overbreadth grounds, we do not find it necessary to reach the question of vagueness.

U.S. 278, 286, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961). When faced with an overbreadth challenge a court must decide, first, if there is a legitimate and substantial state interest in regulating a class of speech, and, if so, whether that interest is being "pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). *See Grayned v. City of Rockford, supra,* 408 U.S. at 119, 92 S.Ct. 2294; *see also Keyeshian v. Board of Regents, supra,* 385 U.S. at 601, 87 S.Ct. 675. The enactment regulating speech, therefore, may not be an impermissibly broad prophylactic; nor can it unnecessarily interfere with first amendment rights. *See Grayned v. City of Rockford, supra,* 408 U.S. at 119, 92 S.Ct. 2294. The crucial question, then, is whether the regulation sweeps within its prohibitions that which is protected under the first and fourteenth amendments. *See id.* at 115, 92 S.Ct. 2294.

 The regulation at issue in this case is directed at comments by police officers. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court recognized that the State has a greater interest in regulating the speech of public employees than in regulating the speech of citizens in general.[15] *Id.* at 568, 88 S.Ct. 1731. In certain situations, a public employee may be discharged on the basis of speech, "without offending [the] guarantees of the First Amendment." *Arnett v. Kennedy,* 416 U.S. 134, 160, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974). *See Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir. 1976). The area of unregulable speech available to public employees is accordingly narrower than that available to the public at large. In our determination of the overbreadth *vel non* of ch. 6:7, therefore, we must consider that the first amendment protections afforded to police officers, at least as those protections apply to regulations directed to speech made in their capacity as police officers (not to mention their capacity as PBA officials), are somewhat more circumscribed than those afforded to members of the public.[16] It is necessary that the regulation be narrowly tailored to effectuate the Department's legitimate interests, while not unduly encroaching upon the first amendment rights of those it regulates.

In this case we can recognize a significant government interest in regulating some speech of police officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale,

15. In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a school teacher, in a letter to a local newspaper, attacked the school board's handling of bond issue proposals, and its allocation of financial resources between the schools' educational and athletic programs. After the letter was published he was dismissed by the Board. The Supreme Court held that Pickering's first amendment rights had been abridged. In so doing, the Court noted that the matters about which Pickering had written were matters of public interest, and further, that his comments had not involved his immediate superiors so as to undermine "the effectiveness of the working relationship between them." *Id.* at 570, 88 S.Ct. at 1735. The Court reiterated the principle that "statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are directed at their nominal superiors." *Id.* at 574, 88 S.Ct. at 1737. Here, we note that Gasparinetti's comments concerned matters of public interest, and that the statements which formed the basis of the charges

against him did not concern his immediate superiors or any other Department member with whom he came into contact in his capacity as a police officer. Of equal significance, Gasparinetti was not personally involved in any way with the Kawaida incidents.

16. In *Muller v. Conlisk,* 429 F.2d 901, 904 (7th Cir. 1970), which held overbroad a similar police department regulation, the court stated:

> To the extent that being a policeman is public employment with unique characteristics, the right of the employee to speak on matters concerning his employment with the full freedom of any citizen may be more or less limited. It is not, however, destroyed. *Pickering, supra,* 391 U.S. at 568, 88 S.Ct. 1731; *Garrity [v. New Jersey], supra,* 385 U.S. [493] at 500, 87 S.Ct. 616 [17 L.Ed.2d 562].
>
> Thus, it is clear that the First Amendment would reach and protect some speech by policemen which could be considered "derogatory to the department."

and instill public confidence in the law enforcement institution. To achieve these ends, regulations may be promulgated, but their restrictive effect may extend only as far as is necessary to accomplish a legitimate governmental interest. As the Supreme Court said in a related context, "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).[16a]

### B.

The disputed "Public Disparagement" (ch. 6:7) regulation provides that a Department member shall not "publicly disparage or comment unfavorably or disrespectfully" on the official actions of superior officers or on the orders of the Department. It is the regulation's prohibition against unfavorable comment which we find to be the most troublesome, as it appears to sweep within its ambit, speech which is clearly protected under the first amendment.

For example, does criticism of the Department's work rules, voiced by a police officer at a public PBA meeting, constitute "unfavorable comment" which could lead to the imposition of sanctions? Has a policeman "comment[ed] unfavorably" when he, in a public setting, claims that a new departmental policy, which requires that patrol cars be manned by but one officer, is not in the public interest? Or is a member of the Department, who is also a PBA representative engaged in contract negotiations with the City, guilty of "unfavorable comment" within the meaning of ch. 6:7 if he charges that the Police Director is not negotiating in good faith? It seems to us that in all these situations ch. 6:7 would be violated, and that consequently *any* publicly voiced disagreement with Department policy would violate ch. 6:7. Yet the first amendment surely protects such expressions of opinion about matters of public concern. *See Pickering v. Board of Education, supra.*

Counsel for the City argued before us that the examples of protected speech cited in the preceding paragraphs would *not* be violations of ch. 6:7. This, however, is not clear to us. Certainly the regulation, on its face, by proscribing unfavorable comment without qualification, would appear to prohibit such statements. Moreover, unlike cases such as *Arnett v. Kennedy, supra; Levy v. Parker*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); and *C.S.C. v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), all of which upheld broadly phrased regulations restricting the speech and conduct of public employees, in the case *sub judice* there is no interpretive guidance (such as administrative or historic interpretations, and prior decisions) to delimit the scope of the regulation.

The City's counsel contended that a "reasonable man" standard must be read into the regulation, and that a police officer, in the exercise of common sense, would know what speech is protected and what speech violates the rule. While we do not hold that an implicit "reasonable man" interpretation can never save an otherwise overbroad enactment, it seems to us that in this case the term "comment unfavorably" is not a "term susceptible of objective measurement," *Cramp v. Board of Public Instruction, supra*, 368 U.S. at 286, 82 S.Ct. 275, and cannot be so legitimated by construing it in accordance with such a standard. For example, the City's attorney, at oral argument, responded to the Court's questioning on this point by asserting that, in his opinion, if a policeman stated at a public meeting that a particular Department policy was "unwise", he would *not* violate ch. 6:7. If, however, the officer stated that the policy was "stupid", he would have "comment[ed] unfavorably" within the purview of the rule. We do not think that a police officer should be required to make such a subtle distinction when it involves his first amendment

---

**16a.** Judge Rosenn, writing in dissent, apparently does not disagree with our expression of the standard against which the challenged regulation must be measured. Dissenting Op. at 320–321.

rights. It is precisely this kind of broad, overinclusive restriction on speech which deprives first amendment freedoms of the breathing space those liberties need to survive, *NAACP v. Button, supra,* 371 U.S. at 432–33, 83 S.Ct. 328, since the person regulated can never be certain that he will not be penalized for speech which is indeed protected.[16b] That avoidance of this chilling effect is at the heart of the overbreadth doctrine, *see Keyeshian v. Board of Regents, supra,* 385 U.S. at 603, 87 S.Ct. 675.

### C.

We recognize that the Newark Police Department has important interests in regulating some speech of its members. Ch. 6:7, however, indiscriminately casts its net so as to catch, along with that speech which the Department may properly regulate, much

speech in which the Department's legitimate interest is minimal. Given the substantial encroachment on the first amendment-protected areas of police officers' speech, the lack of interpretive guidance in construing the regulation, the failure to differentiate between criticism of immediate superiors, which might result in disruption, and criticism of remote superiors, where disruption is unlikely,[17] and the public's strong interest in open debate and access to information about its police,[18] we hold that ch. 6:7 is overbroad and therefore invalid on its face.[18a]

### D.

Other courts, when faced with overbreadth challenges to similarly broad police department regulations, have reached the same result.[19] In *Muller v. Conlisk,* 429

**16b.** Judge Rosenn in dissent admits that the examples which we have cited in the text as probable violations of ch. 6:7 "might well be within the literal language [of the regulation] 'comment unfavorably,'" but only if that phrase is taken out of context. Dissenting Op. at 322. However, claims the dissent, the "overall effect of the rule would not be so inclusive" when it is read in the light of a reasonable man standard, and when the term "comment unfavorably" is read to imply disparaging or disrespectful comment. Id. at 322–323.

The difficulty with this argument is twofold. First, the dissent's interpretation renders the term "comment unfavorably" as mere surplusage, for it equates that term with the two other operative terms of the regulation, giving it no independent content. Second, the dissent would require a police officer to assess the "overall effect" of the regulation rather than to determine if his speech violates the plain language of the regulation. We are not as confident as Judge Rosenn that a police officer could discern the "overall effect" of ch. 6:7, even under a reasonable man standard, so as to know whether or not his intended speech would violate the rule. The dissent would demand that the police officer make a judgment so subtle that to date four different judges passing on the same issue cannot agree as to the proscriptive effect of the regulation. (In contrast with our holding here, the district court judge held, and Judge Rosenn would hold, that the term "comment unfavorably" is susceptible of objective measurement.)

**17.** *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968);

*Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir. 1976). *See also* note 15 *supra.*

**18.** *See Pickering v. Board of Education, supra,* 391 U.S. at 573, 88 S.Ct. 1731. The public interest in free and open debate about its police department's operations is vital. It is important that the public have access to the thoughts and expressions of the rank and file police officer, whose views as to the effectiveness of police policy may be quite valuable to the community. Moreover, there is an especially strong public interest in having a police union leadership who will speak openly and candidly about their members' grievances and demands. Insofar as ch. 6:7's prohibitions could preclude statements by PBA leaders, the public's ability to obtain such information is curtailed.

**18a.** The dissent reaches the opposite result, in large part because of its conclusion that policemen's rights are outweighed by the "powerful need within a police department for unity and obedience . . . [and] for public confidence." Dissenting Op. at 323. We agree that these are legitimate needs. But the same restrictions on a policeman's speech which may further these needs can well be the means by which legitimate criticism is stifled, dissent within the department repressed, and abuses of power concealed. It is in part for this reason that we hold that such legitimate departmental needs must be achieved through properly drawn regulations affecting speech which are not overbroad.

**19.** We do not view *Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51

F.2d 901 (7th Cir. 1970), the court held overbroad a police department regulation which prohibited " '[e]ngaging in any activity, conversation, deliberation, or discussion which is derogatory to the Department or any member or policy of the Department' ". *Id.* at 902. The court concluded that the regulation in effect proscribed *all* criticism by policemen of the department, *id.* at 904, and therefore was invalid. *Cf. Bence v. Breier*, 501 F.2d 1185 (7th Cir. 1974) (holding a police department rule which proscribed "conduct unbecoming" a police officer unconstitutionally vague).

In *Flynn v. Giarrusso*, 321 F.Supp. 1295 (E.D.La.1971), the court invalidated as overbroad a police department regulation which provided that a " 'member shall not unjustly criticize or ridicule, or express hatred or contempt toward, or indulge in remarks which may be detrimental to . . . any person.' " *Id.* at 1299. The court in *Flynn* "fail[ed] to see what possible legitimate interest the . . . Police Department can have to warrant such a sweeping prohibi-

tion on the speech of its members." *Id.* Also, *see Haurilak v. Kelley*, 425 F.Supp. 626 (D.Conn.1977).

Ch. 6:7 of the Newark Police Department Rules and Regulations is open to the same objections as the regulations in *Muller* and *Flynn*.[20] As noted earlier, it essentially prohibits all criticism by police officers of the actions and policies of the Newark Police Department. Moreover, the Department has no legitimate interest in so broadly regulating its members' speech. Just as the regulations in *Muller* and *Flynn* could not pass constitutional muster for those reasons,[21] so ch. 6:7 cannot be sustained here. *See NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338 (1963): "The objectionable quality of . . . overbreadth . . . [is] the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *See also Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).[22]

L.Ed.2d 775 (1977), as contrary to our conclusion. In *Kannisto*, the court refused to hold that a police department regulation, which proscribed "misconduct or any conduct . . . which tends to subvert the good order, efficiency or discipline of this Department or which reflects discredit upon the Department . . . or that is prejudicial to . . . efficiency and discipline . . . ," was invalid. First, we question whether the *Kannisto* court ever really passed on the overbreadth challenge. Second, the regulation in *Kannisto* is distinguishable from those in *Muller, Flynn* and this case, in that it proscribes *conduct*, and is not a direct prohibition on speech (*see Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Moreover, it is restricted to and couched in terms of conduct affecting efficiency and discipline, concerns in which the police department has a strong and clearly legitimate interest.

20. The dissent refers to *Magri v. Giarrusso*, 379 F.Supp. 353 (E.D.La.1974), as a holding contrary to our conclusion. Dissenting Op. at 324. We disagree as we believe that *Magri* is distinguishable. The regulation in that case (set forth in relevant part in the Dissenting Op. at 324) forbid public criticism and ridicule, which in our view is far narrower in its restrictive scope than ch. 6:7's proscription against unfavorable comment. Moreover, the *Magri* regulation by its terms only prohibited that criticism or ridicule which " 'tend[ed] to impair

the operation of the department by interfering with efficiency; interfering with the ability of supervision to maintain discipline; or having been made with reckless disregard for truth or falsity.' " 379 F.Supp. at 357. As such, that regulation is tailored precisely to the interests which the department legitimately may seek to protect. There are no such limitations on ch. 6:7's bar against unfavorable comment.

21. In support of its conclusion that ch. 6:7 is not overbroad because it only prohibits *public* (as distinct from private) speech, the dissent cites *Muller, Flynn, Magri* and *Haurilak* (Dissenting Op. at 323–324). These cases do not sustain the argument advanced by the dissent. While these cases recognize, as do we, that the private or public nature of the proscribed speech has a bearing on overbreadth determinations, none of those cases hold that any proscription on a police officer's public speech, no matter how overbroad, is constitutional.

22. Because we have found ch. 6:7 to be facially overbroad, at least to the extent that it includes a proscription against unfavorable comment, we have not found it necessary to reach the question of whether the regulation, if held to be constitutional on its face, would nevertheless be unconstitutional as applied to Gasparinetti.

## V.

### CHS. 5:4.1 AND 6:8

■ The district court also refused to enjoin the enforcement of chs. 5:4.1 and 6:8 against Gasparinetti. Those regulations provide:

Chapter 5:4.1 OBEDIENCE TO ORDERS—

Police officers or civilian employees shall promptly and fully obey any lawful order directed to them by a superior officer.

Chapter 6:8 ACTS OF INSUBORDINATION—

Department members shall not commit acts of insubordination or disrespect to any superior officer. (As defined in Chapter 2:1.10 of the Rules and Regulations).[23]

The charges brought against Gasparinetti under ch. 5:4.1 read as follows:

CHARGE IV:

Violation of Newark Police Department Rules and Regulations, Chapter 5:4.1— OBEDIENCE TO ORDERS—

Police Officers or civilian employees shall promptly and fully obey any lawful order directed to them by a superior officer. (TWO COUNTS)

SPECIFICATIONS:

1. On April 12, 1973, in the office of the Internal Affairs Division and in the presence of Lieutenant Robert Gauthier, Police Officer Ronald Gasparinetti did receive a lawful verbal order from Inspector George Graf, a superior officer, directing him to submit an "Administrative Submission" DPI:1001, through channels with his answers to the seven (7) questions asked of him by Inspector Graf, and he did wilfully disobey this order when he failed to comply as directed.

2. On April 23, 1973 in the office of the Internal Affairs Division, and in the presence of Lieutenant William Lissenden, Police Officer Ronald Gasparinetti, did receive a direct lawful verbal order from Inspector George Graf, a superior ·officer to submit an "Administrative Report," not a letter, through channels, with his answers to the seven (7) questions asked of him by Inspector Graf on April 12, 1973, and he did wilfully disobey this order when he failed to comply as directed.

(Appendix at 6A–7A). The charges filed against Gasparinetti under ch. 6:8 are virtually identical to those filed under ch. 5:4.1. (Appendix at 7A–7B).

Gasparinetti argues that "[o]nce it is recognized that the Newark Police Department Rules and Regulations sanctioning police officers' speech are unconstitutional . . . it is clear that the disciplinary charges for alleged violations of the remaining Rules (5:4.1 'Obedience to Orders' and 6:8 'Acts of Insubordination') . . . cannot be sustained. The Police Department had no right to inquire into Gasparinetti's constitutionally protected speech and associational interests. . . . Gasparinetti rightly refused to answer questions relating to such protected areas. . . ." Appellant's Brief at 23. He asserts that the validity of any order must be measured by the validity of the regulation pursuant to which the order is made, and he concludes that, if he cannot be sanctioned for the public statements that he made, then he cannot be sanctioned for failure to supply Administrative Reports or Submissions which relate to those statements.

The Police Department charged Gasparinetti with violating chs. 5:4.1 and 6:8 because he refused to make a formal answer to seven questions put to him by Inspector Graf. Instead he submitted two letters, dated April 16, 1973, and April 23, 1973, in which he claimed that the questions concerned matters of PBA interest and were therefore not subject to Department exploration. (Appendix at 31A, 32A).

The district court refused to grant injunctive relief to Gasparinetti with respect to the enforcement of chs. 5:4.1 and 6:8.

---

23. No question has been raised on this appeal with respect to the definitional provisions of ch. 2:1.10.

Its decision, however, was premised on its holding and belief that ch. 6:7 was constitutional. We, on the other hand, have held that ch. 6:7 is overbroad and cannot be constitutionally sustained. Moreover, the seven questions which the Department ordered Gasparinetti to answer do not appear in the record. Hence, we are not in a position to determine whether, in light of the unconstitutionality of ch. 6:7 and the substance of the seven questions, Gasparinetti may be sanctioned for his refusal to answer. That determination should be made by the district court in the first instance.

## VI.

Having concluded that the district court did not err in holding chs. 3:1.2–5 and 3:1.-2–8 unconstitutional, we will affirm so much of the district court's Order of March 2, 1976, as permanently enjoins their enforcement.

However, contrary to the district court, we have also concluded that ch. 6:7 is overbroad and therefore unconstitutional. Accordingly, so much of the district court's Order of March 2, 1976, as denies plaintiffs an injunction as to the enforcement of ch. 6:7 will be reversed, with the direction that an injunction issue against the enforcement of ch. 6:7.

Inasmuch as we are unable to assess the effect of our holding on the district court's disposition of chs. 5:4.1 and 6:8, we will reverse so much of the district court's Order of March 2, 1976, as pertains to those two chapters, and remand to the district court for further proceedings consistent with this opinion.

ROSENN, Circuit Judge, concurring in part and dissenting in part.

I dissent because I believe the judgment and orders of the district court should have been affirmed in toto. The majority affirm the district court in holding that chapters 3:1.2–5 ("DEROGATORY REFERENCE") and 3:1.2–8 ("CENSURING OFFICIAL TRANSACTIONS") are unconstitutionally overbroad on their face, resulting in a chill-ing of first amendment rights. I agree as to this aspect of the majority's opinion for the reasons stated by them and those expressed by the district court. I disagree with the majority's reversal of the district court's holding that chapter 6:7 ("PUBLIC DISPARAGEMENT") is constitutional and the majority's consequent reversal of the district court's refusal to enjoin disciplinary proceedings against appellant, Ronald Gasparinetti ("GASPARINETTI"), brought under chapter 5:4.1 ("OBEDIENCE TO ORDERS") and chapter 6:8 ("ACTS OF INSUBORDINATION").

The majority hold that chapter 6:7 is facially overbroad. I disagree both as to their construction of the rule and to the balance they strike between the individual and governmental interests. I would hold the rule facially valid. I would also reach the question of whether chapter 6:7 is either vague or unconstitutional as applied to Gasparinetti, concluding that neither test renders the rule invalid. Because I believe that chapter 6:7 is constitutional I would affirm the district court's refusal to grant an injunction preventing application of chapters 5:4.1 and 6:8 to Gasparinetti.

## I. PUBLIC SPEECH OF POLICEMEN MAY BE LIMITED

The language of the first amendment is seemingly absolute, that no law shall be passed "abridging the freedom of speech." U.S.Const. Amend I. The Supreme Court, however, has never interpreted this clause that strictly; a balance has been struck between the speech interests of individuals and the governmental need for law and order. See Konigsberg v. State Bar, 366 U.S. 36, 49, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Dennis v. United States, 341 U.S. 494, 508, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

When faced by a challenge to governmental regulation of speech of citizens in general, the Government must present compelling justification for its encroachments, see Brandenberg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam). The government, however, as em-

ployer may exercise some incidental speech control over its employees in furtherance of the goals of their employment. *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

> [T]he government has an interest in regulating the conduct and "the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees."

*CSC v. National Ass'n of Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973), *quoting, Pickering v. Board of Education, supra,* 391 U.S. at 568, 88 S.Ct. 1731.

On this basis public employees may be disciplined for their speech without offending rights secured by the first amendment. *See Sprague v. Fitzpatrick,* 546 F.2d 560, 565 (3d Cir.), *affirming,* 412 F.Supp. 910, 919 (E.D.Pa.1976). (Even though employee is punished for speech, interest of government in stable and effective relations between workers is enough to permit the action).

The need of the government to exercise incidental speech regulation over its employees in furtherance of the goals of their employment is especially justified and necessary with the police. Regardless of the historical origin of the municipal police force, whether as a need to supplement the citizens' role in keeping the peace or an interest in creating a civilian military, municipal police forces are a para-military force by virtue of their organized structure, central control, disciplined rank and file, and uniform dress and appearance, all designed to carry out the efficient conduct of their duties.

The police generally resemble the military—a closed isolated sector with its own customs and needs, *see* Bernard, *Structures of American Military Justice,* 125 U.Pa.L. Rev. 307, 312–33 (1976)—rather than other employees in the public sector. This structure need not necessarily be imposed, but as the Supreme Court indicates in *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), the choice of the local government to organize along para-military lines must be respected by the courts in cases in which the content of police regulations is challenged rather than the structure of the force itself. 425 U.S. at 246, 96 S.Ct. 1440.

"For the reasons which differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and greater flexibility when prescribing the rules by which the former shall be governed than when prescribing rules for the latter." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974). Similarly, states must be given considerable leeway in legislation regulating the local equivalent of the military, the police. In today's highly complex and mobile society, in which crime is assisted by enormous advances in technology, transportation, and instant communication, the policeman is more than ever a trained officer entrusted with responsible and serious assignments as a public servant.

> His work habits on active duty require disciplined conduct, regimentation and frequent strict adherence to regulation and authorized detail. . . . It is essential that a policeman's training be such that he be taught to obey strict discipline, procedure and rules in order to lend practical assurance that he will follow command and not abuse his awesome authority.

*Stradley v. Anderson,* 478 F.2d 188, 190 (8th Cir. 1973). The state, therefore, has a significant governmental interest, succinctly expressed by the majority, "in regulating some speech of police officers in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law en-

forcement institution." Majority Opinion at 315.

While it is true that policemen are not relegated to an emasculated version of constitutional rights, *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), it is equally clear that in certain contexts involving the need for police discipline and *espirit de corps*, the government is entitled to regulate police activity to a much greater extent than "civilians." *See, e. g., Kelley v. Johnson, supra*, (assuming first amendment right in personal appearance, Court holds that state need only show rational need for regulation, unlike compelling need for civilians). Accepting the principle that a police officer is entitled to first amendment protection, it may well be that he is entitled to less than other public servants. *See Muller v. Conlisk*, 429 F.2d 901, 904 (7th Cir. 1970).

## II. THE "PUBLIC DISPARAGEMENT" RULE IS NOT OVERBROAD ON ITS FACE

In assessing claims of overbreadth, this court must first determine the extent of the challenged rule and then balance the governmental need to regulate the speech against the individual's rights. Before considering that balance in this case, the scope of the challenged rule must be established.

The test for constitutionality of a state rule challenged on first amendment grounds is whether the interest of the state in limiting the speech outweighs the interest asserted by the individual. Preliminary to that balancing, however, the court must construe the language of the rule to determine what conduct is proscribed. The majority pose a number of hypotheticals here that they claim come within the ambit of the "public disparagement" rule, including:

(1) criticism of department work rules, voiced at a public PBA meeting; (2) claims that a new departmental policy is against the public interest, stated in a public setting; and (3) charges that a Police Director is not negotiating a contract in good faith—presumably made in a public setting, but not so posed by the majority. Majority Opinion at 315–316. Although each of these hypotheticals might well be within the literal language "comment unfavorably" when the phrase is taken out of context, fairly read, the overall effect of the rule would not be so inclusive.

The Supreme Court in *CSC v. National Ass'n of Letter Carriers, supra*, 413 U.S. at 571, 93 S.Ct. at 2893, reminds us that "our task is not to destroy [challenged regulations] if we can, but to construe [them] . . . so as to comport with constitutional limitations." Our duty then is to give narrow effect to rules of police conduct so as to limit their possible overbreadth. The majority has indicated that the language "publicly . . . comment unfavorably" is that which may be unconstitutionally applied. Their construction of that language flies in the face of the Court's admonition in *CSC v. National Ass'n of Letter Carriers* and is unnecessarily broad. The rule must be read, not only in light of a reasonable man standard as suggested by the Police Department, but more importantly within the context of the rule itself.[1]

Chapter 6:7 is not focused primarily at the content of speech as it is on the *forum* for it. The rule is directed against the use of a public forum for speech coupled with departmental disparagement. The rule then is seen as akin to a time, place, and manner regulation, much like a prohibition against "fighting words." *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct.

1. The majority do not hold that an implicit reasonable man standard can never be employed to narrow the scope of a challenged rule. The majority maintain that the language of chapter 6:7, "comment unfavorably," is not susceptible of objective measurement. I think the majority would be correct if that was the sole term used within the rule. However, they ignore the title of the chapter, PUBLIC DIS-

PARAGEMENT, as well as its other terms, disparage and disrespect. The example given at page 316 of the Majority Opinion of distinguishing between "unwise" and "stupid" is not so difficult to make, given the overall effect of the rule. I am inclined to hold that the reasonable man standard is applicable here but find it unnecessary, given my affirmation of the facial constitutionality of the challenged regulation.

766, 86 L.Ed. 1031 (1942); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Chapter 6:7 is headed "PUBLIC DISPARAGEMENT." The rule prohibits members from *publicly disparaging* and *publicly commenting unfavorably* or *disrespectfully* on official action of police superiors or departmental rules or orders. Read in context, unfavorable is joined inextricably with disparaging and disrespectful. So read, the rule is intended to limit public unfavorable comment, but unfavorable must be read to imply public disrespect or disparagement. There is little difficulty in concluding that the rule is not aimed at mere unfavorable public comment; its overall purpose and tone indicate a need to show something greater. Therefore, the majority conclusion that "*any* publicly voiced disagreement" would violate chapter 6:7 is unwarranted.[2] Even were we to accept the majority's construction of the rule, the relevant cases require that we sustain the regulation. The majority recognize that there is "a significant government interest in regulating some speech of police officers." Yet, even given this legitimate governmental interest the majority hold that the Department may not enforce chapter 6:7 for sufficient breathing space is not provided for enjoyment of first amendment rights. Ma-

jority Opinion at 316. Had this been a case involving teachers or other public employees, such a conclusion might have been plausible, but because the rule is aimed at police officers it seems to me that the balance required by *Pickering* would sustain the "public disparagement" rule.

The majority have drawn a bright line between chapter 6:7's prohibition against public disparagement and public disrespect and its prohibition against public unfavorable comment. It seems that the distinction is really trivial, for the three provisions read together attempt to serve an identical purpose, the deterrence of *public statements* which tend to destroy morale and unity within the ranks of the police force and public confidence in the police department. There is a powerful need within a police department for unity and obedience; there is an equally strong necessity for public confidence. It is of great importance that subordinates show proper respect to superior officers. Without some rules limiting public criticism, morale and public confidence in the police would likely be undermined.[3]

Chapter 6:7 does not prevent criticism absolutely. A reasonable latitude for criticism is permitted. Police officers are free to criticize among themselves or to level

---

2. Although the majority do not hold that the parts of chapter 6:7 prohibiting public disparagement and disrespect are constitutional, they address themselves only to "comment unfavorably." Because as I read the rule, unfavorable comment is qualified by public disparagement and disrespect, the problems posed by the majority are readily resolved.

3. Gasparinetti's conduct here exemplifies the need to prohibit disparaging public statements by police officers about their superiors and about official policy. In the wake of bitter racial turmoil in the city of Newark, Gasparinetti publicly made various derogatory statements about his superiors and about official policy:

 1. "That six (6) police officers were transferred after alleged pressure brought on Police Inspector Thomas Critchley by LeRoi Jones (Imanu Amiri Baraka)," or words to that effect.
 2. "Critchley was assigned to the Tactical Squad in order to break the morale and spirit of the men," or words to that effect.

3. "When a man such as Critchley succumbs to political pressure and threats of LeRoi Jones, then he is operating outside the Rules and Regulations," or words to that effect.
4. "The public wants to know why the police department doesn't do its job. Well, this is a very big part of the answer. We have the men that are willing to face the criminals but when they are led by superiors like Critchley they hesitate," or words to that effect.
5. In reference to picketing in front of Newark City Hall he said, "We picketed to let people know we have cowards in superior officer ranks," or words to that effect.
The overall effect of such public statements can only undermine public confidence and department efficiency. The complaints could easily have been made *privately*, within established lines for criticism within the department or by letters to superiors or elected officials who could remedy the situation. To prevent such incidents, rules such as chapter 6:7 are enacted.

criticism at their superiors. Only criticism which publicly disparages police policy and superiors is restricted. Private channels of communication are left open. The majority ignore this freedom of the police to exercise an extensive range of speech, speech which may be highly critical, derogatory, or inflammatory. Any private communication is permissible; any public communication which is not disparaging is also permissible. The fear of chilling the exercise of free speech expressed by the majority is overdrawn. Even the cases which the majority cite support my view that the line for constitutional purposes is not between commenting and disparaging but is between public and private speech.

*Muller v. Conlisk, supra,* involved a challenge to a regulation of the Chicago police department which "on its face prohibit[ed] all such speech [disparaging in nature], even private conversation . . . ." 429 F.2d at 904. It was for that reason that the rule was found overbroad. *Id.* Of like effect is *Haurilak v. Kelley,* 425 F.Supp. 626 (D.Conn.1977), in which a police regulation which prohibited department employees under any circumstances from speaking critically or derogatorily "to other members or employees" as well as outsiders was challenged. *Id.* at 629. The regulation was found unconstitutional because it punished the officers for "discussing among themselves the merits of any order or instruction . . . ." *Id.* at 632.

*Flynn v. Giarrusso,* 321 F.Supp. 1295 (E.D.La.1971), cited by the majority, does not help in their quest to draw the line between public comment and public disparagement. It too involved a regulation prohibiting criticism directed to "any person," public or private. *Id.* at 1299. However, *Magri v. Giarrusso,* 379 F.Supp. 353 (E.D. La.1974), decided by the same district court found facial validity in the following regu-

lation adopted by the police department after the *Flynn* case which is quite similar to the "public disparagement" rule under attack in the instant case:

## CRITICISM

Members and employees shall not *publicly criticize* or ridicule the department, its policies or other employees by talking, writing or expressing any other manner, where such talking, writing or other expression:

 \* \* \* \* \* \*

d. tends to impair the operation of the department by interfering with its efficiency; interfering with the ability of supervisors to maintain discipline; or having been made with reckless disregard for truth or falsity.

379 F.Supp. at 357 (emphasis supplied).

The court concluded that the problems expressed with the similar rule declared unconstitutional in *Flynn* had been cured. *Id.* at 358 ("Article 33 does not distinguish between public and private speech. . . ."). Any distinction between publicly unfavorable comment and "publicly criticize" eludes me. I agree with the *Magri* court that in this context it is the prohibition of private speech which is constitutionally prohibited, not incidental effects on public speech.[4] I see no substance to the distinction which the majority draws between "publicly criticize and ridicule" in the *Magri* regulation and the "public disparagement" regulation in this case. (Majority Opinion p. 318 n.20).

The "public disparagement" rule does not sweep too broadly in effectuating the governmental interest in the morale and unity of the police force. It does not prevent dissent or criticism. Intra-departmental lines for redress of problems are available. Public criticism of non-police officials and events is not prohibited. The regulation

---

4. The same distinction was drawn by the district court in the instant case. It held that chapters 3:1.2–5 (derogatory reference) and 3:1.2–8 (censuring official transactions) were overbroad on their face and that chapter 6:7 was facially valid. The only real distinction between the sections is that chapter 6:7 is di-

rected only at public speech whereas the other chapters are directed at all communication. The majority really do not address this distinction adequately and instead concentrate on fine distinctions of language which need not be made.

only limits disrespect, disparagement, and unfavorable criticism voiced in a public forum. The fine line the majority attempts to draw in a police organization between unfavorable public comment and disparagement is unsound and untenable.[5] The clear line for constitutional challenges, as shown by *Muller v. Conlisk, supra; Haurilak v. Kelley, supra; Magri v. Giarrusso, supra;* and *Flynn v. Giarrusso, supra*, is that drawn between public speech and private speech. Unless the rule is so broad as to prohibit all criticism or a very large portion which would include private communication, rules regulating public speech by police officers are facially valid.

## III. CHAPTER 6:7 IS NEITHER VAGUE NOR UNCONSTITUTIONAL AS APPLIED TO GASPARINETTI

Appellants have challenged chapter 6:7 as unconstitutionally vague and as unconstitutionally applied to Gasparinetti. Judge Lacey held that chapter 6:7 was neither vague nor unconstitutionally applied. I agree.

The language of 6:7, though not totally clear, is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." *CSC v. National Ass'n of Letter Carriers, supra*, 413 U.S. at 579, 93 S.Ct. at 2897. Vagueness may be found when a regulation is so vague that men of ordinary intelligence must guess as to its meaning and differ as to its application. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). I agree with Judge Lacey that chapter 6:7 is reasonably specific. It is written in terms which are understandable and which provide notice as to what conduct is prohibited; it is not vague. *See Arnett v. Kennedy, supra*, 416 U.S. at 161, 94 S.Ct. 1633.

Gasparinetti was charged with violating chapter 6:7 by publicly disparaging and commenting unfavorably or disrespectfully about the official actions of two superior officers, Deputy Chief Thomas Henry, and Inspector Thomas Critchley, and about the rules, regulations, procedures, and orders of the police department. Specifically, the charges alleged that Gasparinetti said: (1) that police officers were transferred as a result of political pressure brought by a black leader on Critchley; (2) that Critchley attempted to break the morale of the men; (3) that Critchley operated outside the rules and regulations of the department; (4) that men like Critchley could not effectively lead others; and (5) that many superior officers were cowards.[6]

These remarks, especially the public charge that superior officers were "cowards," were of such character as to undermine public confidence in the leaders of the police force and disturb the working relationship of the rank-in-file to their superiors. As such, these remarks were punishable by the Department. *Pickering v. Board of Education, supra* suggests that the governmental interest in limiting speech must outweigh the individual's right to fair comment if application of a rule is to be constitutional. I think that there can be no doubt that in this case Gasparinetti's asserted first amendment rights are outweighed by the Department's need for discipline and order. It is permissible to punish truthful criticism where effectiveness of the employment relationship is undermined. *See Sprague v. Fitzpatrick, supra*, 546 F.2d at 565.

## IV. CHAPTERS 5:4.1 AND 6:8 NEED NOT BE ENJOINED

Disciplinary charges were brought against Gasparinetti under chapter 5:4.1

5. Even accepting such a reading, prohibition of the conduct here could survive constitutional challenge. The Supreme Court has expressed hesitancy to find overbroad rules which are substantially valid. *See CSC v. National Ass'n of Letter Carriers, supra*, 413 U.S. at 581, 93 S.Ct. 2880. Thus, even if there are marginal applications of the regulations which would infringe on the first amendment, facial invalidation is inappropriate if there is a whole range of

constitutionally prohibitable conduct. *Parker v. Levy, supra*, 417 U.S. at 760, 94 S.Ct. 2547; *CSC v. National Ass'n of Letter Carriers, supra*, 413 U.S. at 580–81, 93 S.Ct. 2880. Even the majority would agree that the rule here could be applied constitutionally to many police activities.

6. For the text of Gasparinetti's statements *see* Dissenting Opinion at 323, n.3.

**326**

("OBEDIENCE TO ORDERS") and chapter 6:8 ("ACTS OF INSUBORDINATION")[7] because he refused to make a formal answer to seven questions—presumably concerned with his public statements about his superiors and official policy—put to him by a superior officer. Instead, Gasparinetti claimed that the questions asked him to reply to areas not subject to scrutiny by the Department. The district court refused to grant an injunction preventing enforcement of disciplinary proceedings against Gasparinetti. The majority apparently remand the question to the district court in light of their reversal of the constitutionality of chapter 6:7. Because I find chapter 6:7 constitutional, I see no need to disturb the district court's refusal to grant the injunction. I would affirm the holding.

### V. CONCLUSION

(1) For the reasons stated by the majority, I concur that chapters 3:1.2–5 and 3:1.-2–8 of the Newark Police Department Rules and Regulations are unconstitutionally overbroad.

(2) Chapter 6:7's prohibition of publicly disparaging and publicly commenting unfavorably or disrespectfully is necessary to effectuate the goals of morale, discipline, and public confidence in the Department. The rule is directed at public disparagement; the incidental impact on free speech is mitigated by open access to all private channels of communication. Given the needs of the police, the deference given to regulations of paramilitary organizations, and the limited nature of the intrusion on rights, chapter 6:7 is not overbroad on its face.

(3) The terms of chapter 6:7 are susceptible of understanding by the ordinary man or woman; it is not vague.

(4) Gasparinetti's conduct had the clear effect of undermining morale and discipline on the police force. The Department may therefore discipline him without doing violence to the constitution.

(5) Chapter 6:7 is constitutional in all respects. Therefore, the district court's holding refusing to enjoin application of chapters 5:4.1 and 6:8 to Gasparinetti should be affirmed.

---

7. For the text of chapters 5:4.1 and 6:8 *see* Majority Opinion at 319.