Irvin L. MAGRI, Jr., and P.A.N.O., Local
641–N.U.P.O., AFL–CIO

v.

Clarence Benedict GIARRUSSO et al.

Civ. A. No. 74–1997.

United States District Court,
E. D. Louisiana.

Aug. 7, 1974.

Sanford Krasnoff, Irwin R. Sanders, Michael S. Guillory, New Orleans, La., for plaintiff Irvin L. Magri, Jr.

Gerald Thomas LaBorde, John H. Brooks, LaBorde & Brooks, New Orleans, La., for plaintiff Policemen's Ass'n of New Orleans.

Jeffrey L. Kreisberg, Levin & Weissman, New York City, for National Union of Police Officers amicus curiae.

Blake G. Arata, City Atty., Frank J. Varela, Joel Loeffelholz, Michael A. Starks, Asst. City Attys., for defendants.

HEEBE, Chief Judge:

Plaintiff, Irvin L. Magri, Jr., was dismissed from his job as a sergeant with the New Orleans Police Department on July 18, 1974. As the letter of dismissal from the Superintendent of Police, Clarence B. Giarrusso, makes clear, this action was taken because of Magri's persistent public criticism of the superintendent, in violation of the regulations of the department. Suit was filed against the superintendent and the mayor, Moon Landrieu, pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983, seeking reinstatement due to the alleged infringements of rights protected by the First and Fourteenth Amendments.

After a lengthy hearing in which numerous problems relating to the administration of the police department and the city itself were aired, the following picture emerges. Giarrusso was appointed Police Superintendent in August of 1970, at which time Magri, then a patrolman on the force, was organizing the Patrolman's Association of New Orleans. In fact, he had been elected its president in November of 1969. From the time Giarrusso took office, relations between the two were, to say the least, strained. As president of the Patrolman's Association of New Orleans, Magri wrote literally hundreds of letters to the superintendent critical of the police department's practices and policies. Carbon copies of many of these letters were sent to local television and radio stations and the local newspapers. In the first several months of Giarrusso's tenure, Magri mailed to the superintendent over one hundred of such letters. In addition, Magri habitually held press conferences, issued press releases and appeared on television and radio to publicize a wide variety of the problems confronting the police department, such as low pay, deteriorating district stations and the lack of adequate equipment, problems, we note, which plague the police departments of many large cities across the nation. The radio appearances took the form of a weekly talk show. Although the superintendent also utilized the media to respond to Magri's public criticism of himself and his policies, there is evidence of only one occasion during this time when Magri was ordered to temper his remarks. This occurred in September of 1970, only one month after Giarrusso took office. During this period, a confrontation had developed between the Black Panthers and the police, and Magri was ordered by the superintendent to cease making public comments offensive to the black community.

Feelings between the mayor and Magri were also strained. Mayor Landrieu

testified (and his testimony was uncontradicted) that during his mayoralty campaign, Magri also criticized the public accommodations law of New Orleans, which the mayor had authored, and expressed grave concern that, if elected mayor, Landrieu would appoint a black to a key leadership position in the police department. This was conveyed to Landrieu in an interview between him and Magri early in Magri's career as a union official and marked the start of this stormy relationship.

In 1972 the city decided to negotiate a collective bargaining agreement with the Patrolman's Association of New Orleans. During the several months of difficult bargaining sessions which ensued, the level of publicly aired animosity between the parties reached a new high. Negotiations broke off but resumed and finally culminated in the signing of a collective bargaining agreement between the city and the Patrolman's Association of New Orleans on September 13, 1973. City officials, including the mayor, were hopeful that the signing of this agreement would mark the beginning of a more responsible and mature relationship between the parties. In fact, a period of relative calm did follow. The Court thus finds that from 1969 through 1973 no attempt was made to curb Magri's comments on matters of public concern relating to the police department and its relationship with the union and the public. We, therefore, focus our attention on events which occurred in 1974, as Magri's firing was provoked by statements made during that time.

Before turning to these statements, it is necessary to detail to a certain extent the context in which they were made. Within approximately three months of the signing of the contract, the first crisis developed. The Collective Bargaining Contract provided, *inter alia*:

"Supervisory employees (including but not limited to the Superintendent of Police, Deputy Superintendent . . . *Sergeants, Desk Sergeants*) . . .

*are specifically excluded from the provisions of this Agreement and from membership in the Patrolmen's Association of New Orleans.*" (emphasis added)

On December 7, 1973, the city was informed that the Patrolman's Association of New Orleans and the Supervisor's Association of New Orleans had voted to merge into one union, effective December 31, 1973. The new union was to be known as the Policeman's Association of New Orleans. At approximately this time and at his own request, Magri was promoted to the rank of sergeant. He continued to serve as president of the new union. City officials questioned the legal relationship between the newly formed union and the city in view of the portion of the Collective Bargaining Contract quoted above, and also questioned the status of Magri as union president. This confusion occasioned by the merger prompted Giarrusso to thereafter refer publicly to Magri as the "alleged union president." Magri, on the other hand, maintained that the merger had no effect on either the Collective Bargaining Contract or his own status as union president.

The next major disagreement between the parties occurred early in 1974 over the question of a policemen's pay raise. Magri had stated before the City Council that he and his men would accept a plan which would cut overtime funds and put those monies into a base salary increase instead, though there is much confusion as to the specific nature of the pay plan which Magri agreed to on behalf of the union. At any rate, the city adopted a new pay plan which resulted in an order by Superintendent Giarrusso on April 30, 1974, freezing police overtime funds. The net result for many policemen who rely heavily on overtime is a substantial cut in take-home pay which will not be offset for most policemen by the base pay raise. Needless to say, these men are extremely critical of the new pay plan. Their anger was directed at Giarrusso, the mayor, and even Magri, himself. Magri's public response,

as reported in the news media on May 2, 1974, was to label the new pay plan a "cruel hoax" on the city's policemen and to call on the superintendent to rescind the order. These statements served only to further poison the atmosphere and to confuse the members of the department. One of the first city officials to respond to Magri's attacks was the city's chief administrative officer who said that he was confused over the anger of the policemen because of the fact that their own representative, Magri, had initially agreed to the new pay plan. Superintendent Giarrusso publicly answered Magri's attack upon him on May 6, 1974, by saying that it was not he but Magri who had "sold [his men] down the river." The situation grew so tense that it was widely rumored that the policemen were considering a strike to protest the new pay plan.

On May 7, 1974, Magri made the first of a series of public statements which form the basis for his ultimate discharge. On that date Magri appeared on a local radio interview program and stated that:

> ". . . I do honestly believe as I stated earlier in this show that the Superintendent of Police, Clarence B. Giarrusso, is attempting to promote a strike by stopping the overtime funds and, of course, we are going to do whatever we can to have these funds unfrozen so to speak, but I would not like to think that the City would be without policemen."

On that same date Magri told the media in reference to the superintendent:

> "I said I thought he was a coward because he didn't use my name in the press release, just referred to me as the alleged police union president, so I take this opportunity to again call him a coward."

Also on May 7, 1974, Magri declared in a television interview:

> "Yet, Superintendent Giarrusso has impounded that fund, to cause internal strife in the Police Department."

During a May 22, 1974, interview, Magri stated, again in reference to Superintendent Giarrusso:

> "The Superintendent was lying when he said, 'I had sold my men down the river' in regards to the pay raise that the City Administration bestowed upon us. Because what he said, he called me an 'alleged union president' and on that fact I of course—and of course, called him a coward on that fact—that he was being cowardly in not mentioning my name, but rather referring to me as an alleged union president."

Then on July 5, 1974, during the course of an hour and a half radio program, Magri called for the superintendent's resignation. He stated during this program:

> "Well, Guy, you get the news scoop of the week on this show. Maybe you can use this tomorrow on the news service if you so desire. That is that tonight I'm going to a PANO meeting, a general membership meeting, which we except to be very large in number and there's a. resolution that's been prefiled with the chair, in other words somebody's already prefiled a resolution, asking for the resignation and retirement, and/or retirement, I should say, of the Superintendent of Police, Clarence B. Giarrusso."

On July 6, 1974, in a television interview, Magri made the final derogatory public comment about the superintendent for which he was fired when he referred to Giarrusso as a liar:

> "Superintendent Giarrusso is the only Chief of Police in Louisiana that took a very anti-police attitude in Baton Rouge, and what I mean by that is one of the key reasons we are calling for his removal is due to his complete lies in regards to the compulsory binding arbitration bill. We don't mind being beat in Baton Rouge but we do mind when a Chief of Police from a large metropolitan city comes up and deliberately lies to the State Legislators and the citizens of this state in, to effect, to scare them and frighten

them and we believe Chief Giarrusso did the entire police service a tremendous injustice. Giarrusso doesn't deserve to be Chief of Police and that's as simply as I can say it and the men support me solidly in this instance."

This statement was made in response to Giarrusso's testimony before a state legislative committee against a proposed collective bargaining and compulsory binding arbitration bill for policemen. The superintendent at this point determined that though he should permit responsible public criticism, he could not permit personal attacks on his credibility, integrity and leadership ability which had obviously been impugned when Magri had called him a "coward" and a "liar." On July 18, 1974, Magri was handed a letter of dismissal signed by Superintendent Giarrusso. The lengthy letter informed Magri that his dismissal had been occasioned by a:

"pattern of public statements . . . which have proven detrimental to this Department. These statements . . have had a severe deleterious effect upon day to day operation and administration by my office and subordinate supervisory personnel as well as adversely affecting individual employees."

The letter further stated that:

"More particularly, vindictive inflammatory remarks made by you without any proof, whatsoever and with a reckless disregard of the actual facts known to you, or personally discoverable by you, were apparently calculated and have tended to undermine the authority of my office in connection with the efficient administration of the Department as well as having an adverse effect on leadership and morale."

The letter went on to cite those particular statements quoted above upon which the superintendent relied in discharging Magri, statements which Magri has never denied having made. The superintendent concluded the letter by advising Magri that his intemperate remarks constituted a violation of several departmental regulations, including most importantly, Article 33 which reads in pertinent part as follows:

## "CRITICISM

Members and employees shall not publicly criticize or ridicule the department, its policies or other employees by talking, writing or expressing in any other manner, where such talking, writing or other expression:

\* \* \* \* \* \*

d. tends to impair the operation of the department by interfering with its efficiency; interfering with the ability of supervisors to maintain discipline; or having been made with reckless disregard for truth or falsity."

Magri's major contention before this Court is that he was discharged from his position with the New Orleans Police Department in abrogation of his right to freedom of speech guaranteed by the First and Fourteenth Amendments to the Constitution. Additionally, he maintains that Article 33 is unconstitutionally vague and that the Police Department failed to accord him procedural due process in effectuating his dismissal.

■■ Before reaching these issues, however, it is appropriate that we answer the defendant's argument that the law requires that Magri exhaust his available administrative remedies before presenting his constitutional claims to a federal court. As a civil service employee of the City of New Orleans, Magri could have appealed his discharge to the City Civil Service Commission which would have given him a full evidentiary hearing. Instead, however, Magri chose to contest the constitutionality of his discharge in a federal forum under 42 U.S.C. § 1983. The Fifth Circuit, in Moreno v. Henckel, 431 F.2d 1299 (1970), and Rainey v. Jackson State College, 435 F.2d 1031 (1970), concluded that the exhaustion of state administrative remedies is not a prerequi-

site to the filing of a 42 U.S.C. § 1983 suit. Furthermore, the United States Supreme Court in Gibson v. Berryhill, 411 U.S. 564, at 574, 93 S.Ct. 1689, at 1695, 36 L.Ed.2d 488 (1973), stated:

"But this Court has expressly held in recent years that state administrative remedies need not be exhausted where the federal court plaintiff states an otherwise good cause of action under 42 U.S.C. § 1983. McNeese v. Board of Education, 373 U.S. 668 [, 83 S.Ct. 1433, 10 L.Ed.2d 622] (1963); Damico v. California, 389 U.S. 416, [, 88 S.Ct. 526, 19 L.Ed.2d 647] (1967)."

Of course, the exhaustion of administrative remedies ought nevertheless to be required when such remedies are found to be adequate in light of the nature of the issues raised for adjudication. In the case at bar, however, the only issues presented are constitutional in nature which involve the possible abrogation of important free speech rights. We do not think it appropriate in such a situation to compel a § 1983 claimant to present constitutional issues such as those raised here to the City Civil Service Commission, where their particular expertise is not required, before bringing them to a federal court for resolution.

■ Plaintiff asserts that the language in the departmental regulation which prohibits public criticism of the department that *"tends* to impair the operation of the department by interfering with its efficiency; interfering with the ability of supervisors to maintain discipline; or having been made with reckless disregard for truth or falsity" (emphasis added) is vague and overbroad on its face and therefore punishes constitutionally protected free speech. We note at the outset that this article has been added to the regulations since 1971 when this Court struck down several departmental regulations, in Flynn v. Giarrusso, 321 F.Supp. 1295 (E.D.La.1971), as being vague and overbroad. This new article was an attempt to rectify that which this Court found objectionable. In this regard we think it was successful. Article 33 does now distinguish between public and private speech, and it does limit the prohibition on speech to statements regarding the police department and its employees. Consequently, we do not find that the regulation is overbroad. Nor do we find that it is unconstitutionally vague in that there is now a standard against which a reviewing board or court can scrutinize the objectionable activity of a policeman. Recently, the Supreme Court in Arnett v. Kennedy, 416 U.S. 134, 94 S. Ct. 1633, 40 L.Ed.2d 15 (1974), had occasion to test language which authorized the discharge or suspension of a federal employee "for such cause as will promote the efficiency of the service" under the doctrines of vagueness and overbreadth. This language, which does not provide as much guidance for employee conduct as the language presently under consideration, was found not impermissibly vague or overbroad in its regulation of the speech of federal employees.

In discussing the difficulty in arriving at language which covers an infinite variety of factual situations and yet is worded with great specificity, the Supreme Court in *Arnett, supra,* 94 S.Ct. at 1648, quoted the language of Judge Leventhal writing for a panel of the United States Court of Appeals for the District of Columbia Circuit in Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822, 835, modified, 138 U.S.App.D.C. 38, 425 F.2d 469, affirmed en banc, 138 U.S.App.D.C. 41, 425 F.2d 472:

". . . it is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.' We think it is inherent in the employment relationship as a matter of common sense if not [of] common law that [a government] employee . . . cannot reasonably

assert a right to keep his job while at the same time he inveighs against his superiors in public with intemperate and defamatory [cartoons] . . . . [Dismissal] in such circumstances [neither] comes as an unfair surprise [nor] is so unexpected as to chill . . . freedom to engage in appropriate speech."

The instant Court would never intentionally put its stamp of approval on a regulation which includes language that would permit discharge of a public employee for exercising a constitutional right, as witnessed in Flynn v. Giarrusso, *supra*. However, that does not mean that a court should strike down language as vague which sets out prohibitions on the speech of public employees ". . . in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973). The regulation is now couched in reasonably specific terms. It is in the public interest to sustain this more narrowly drawn regulation. It permits the police department, which is of course quasi-military in character, to maintain the chain of authority vital to its orderly and effective operations.

█ Plaintiff next asserts that the manner of his discharge denied him his right to procedural due process. He complains that he was given no forewarning of the impending dismissal and was not granted a reasonable opportunity to respond to the superintendent prior to his discharge. This is in addition to his claim of a right to a full evidentiary hearing *before* discharge contrary to the procedure provided in Rule II, Section 4.1, of the New Orleans City Civil Service Commission Rules. This rule provides that:

"Regular employees in the classified service shall have the right to appeal to the Commission from suspension, fire, dismissal, reduction in pay or de-

motion, to test the reasonableness of such action."

This right to appeal is in the nature of a full adversary hearing with a right to call and cross-examine witnesses, subpoena and present evidence and submit briefs and memoranda of law. Under the current state of the law, we do not think it is required that a public employee, whether federal, state or municipal, be afforded a pre-termination hearing. In Davis v. Vandiver, 494 F.2d 830 (5th Cir. 1974), a case involving the dismissal of a flight training instructor from the Air National Guard, the Fifth Circuit was presented with the issue of due process requirements surrounding the discharge of a nonprobationary federal employee as was the Supreme Court in *Arnett*. The Fifth Circuit stated in *Davis, supra,* 494 F.2d at 832:

" . . . our hand is clearly guided by [Arnett], inasmuch as six Justices expressly concurred in the proposition that a post-termination hearing was sufficient to protect those interests meriting due process protection, whether those interests were in the nature of 'property' or 'liberty.' The plurality opinion in *Arnett* indicated that by incorporating express procedures into the statute which also conferred rights on federal employees, Congress delineated the full extent of the 'property interest' enjoyed by the employee in continued retention of his post."

The Department of City Civil Service rules which create the classes of employees and allocates positions, *inter alia,* further details the nature of the post-termination hearing in Rule II 4.2 through 4.7. We do not see any meaningful distinction between *Arnett* and *Davis* on the one hand and the case presently under consideration. Magri obtained and retained his government employment in much the same manner as the plaintiffs in those cases.

█ In both *Arnett* and *Davis,* the plaintiffs were provided with notice of the charge and were granted a reason-

able opportunity to respond prior to their discharge. We note with disapproval that Magri was not afforded a similar opportunity, although we do not agree that he was dismissed with no forewarning. The mayor of New Orleans, on several occasions, warned him that his abusive remarks concerning the superintendent could bring about his discharge. There undoubtedly are appropriate cases in which it would serve some useful purpose to reinstate a discharged employee and require that a notice of proposed removal provide for some type of hearing before the responsible authority. However, under the peculiar facts of this case, we think we would be performing a meaningless act. As previously pointed out, Magri has never denied publicly calling his superior a "liar" and a "coward" nor has there ever been any indication he would cease making such statements in the future.

Accordingly, we turn to the merits of this case to determine whether a police officer, who is both a sergeant on the force and president of the policemen's union, has a protected right to make public statements, which were previously quoted, such as Magri made. The controlling law dealing with public statements by public employees is found in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which a teacher was dismissed by the Board of Education for publishing a letter in a newspaper which was critical of the Board. In *Pickering*, the Court held that " . . . absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." We could easily rest our decision on a finding that no constitutionally protected conduct on Magri's part was the basis of his discharge, i. e., that the false statements were knowingly or recklessly made. *See*, Whitsel v. Southeast Local School District, 484 F.2d 1222 (6th Cir. 1973). His statements that the superintendent was a "coward" and a "liar"

were in response to statements of the superintendent in reference to matters about which Magri knew there was a difference of opinion. For example, he knew that the superintendent referred to him as "an alleged union president" because his official status as the union president had been challenged by the city under its contract with the patrolmen's association. Magri's statement that the superintendent impounded police overtime funds "to cause internal strife in the Police Department," which was obviously false, could only have been knowingly and recklessly made. Plaintiff introduced no evidence that Giarrusso did not have the welfare and best interests of his men at heart. On the contrary, this Court takes note, from the media over a period of years, of the superintendent's constant efforts to run a harmonious department.

■ However, even in *Pickering*, the Court made it clear that government employees may, in certain situations, be discharged for their speech without offending First Amendment guarantees. The Court stated in *Pickering, supra*, 391 U.S. at 568, 88 S.Ct. at 1734:

> "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

We are faced with the right of a policeman to speak out on matters of public concern against the superintendent's interest in promoting the efficiency of the police department. In balancing these conflicting interests, courts focus on those factors which the Court in *Pickering* indicated were absent from its case

when it reinstated the plaintiff. These factors are succinctly set forth by the District Court for the District of Columbia in Tygrett v. Washington, 346 F. Supp. 1247, 1251 (1972):

"1. Pickering's statements were not directed towards a person with whom he would normally be in contact in the course of his daily work as a teacher. 391 U.S. at 569–570, 88 S.Ct. at 1735;

"2. Thus there was not present any question of maintaining discipline by immediate superiors and harmony among co-workers. *Id.* at 570, 88 S.Ct. at 1735;

"3. Pickering's relationship with the Board of Education was not the kind of close working relationship for which it could be claimed that personal loyalty and confidence are essential. *Id.*, 88 S.Ct. at 1735;

"4. Pickering's letter did not damage the professional reputation of the Board of Education and did not foment controversy and conflict among Pickering's co-workers. *Id.*, 88 S.Ct. at 1736."

All of these elements not found in the *Pickering* case are present in the instant one. It hardly needs pointing out that the superintendent needs the confidence and loyalty of his men in order to run an effective police department, in order to maintain an efficient and disciplined force. Magri's insubordinate remarks, bordering on the defamatory, worked to destroy this relationship between the superintendent and his men. That this is so was witnessed by the instant Judge who, in his courtroom, watched police supporters of Magri turn their backs on the superintendent of police as he entered and departed the courtroom on many occasions. The testimony of various ranking policemen of the force was to the same effect.

A public employee enjoys the rights of freedom of expression conferred by the First Amendment. This Court would have recognized and, indeed, encouraged responsible public criticism of the superintendent's policies, of the pro-posed police pay raise and of the proposed compulsory arbitration bill. But that does not include vitriolic remarks which this Court finds threatened significant working relationships vital to the administration of the police department.

Finally, Magri has argued that, as union president, he should be given wide latitude to criticize the superintendent and his policies. Although we agree that the extent of his criticism may be greater, his criticism in the capacity of union president has limits implicit in his status as a member of the police department. We have found those limits were overreached.

For the foregoing reasons,

It is ordered, adjudged and decreed that the relief of reinstatement sought by plaintiff in his Complaint and Application for Injunctive Relief, be, and the same is hereby, denied.