W. D. CLARY et al.

v.

L. D. IRVIN, Chief of Police of the City
of Crockett, Texas et al.

No. TY–80–198–CA.

United States District Court,
E. D. Texas,
Tyler Division.

Sept. 16, 1980.

Martha McCabe, Joe K. Crews, Tyler,
Tex., for plaintiffs.

Charles H. Clark, Tyler, Tex., for defendants.

MEMORANDUM OPINION

JUSTICE, Chief Judge.

Crockett is a city of some 10,000 residents, the county seat of Houston County, in East Texas. As of June 1980, its Police Department numbered only nine officers, including the Chief of Police, L. D. Irvin, one patrol sergeant, one criminal investigator, and six patrolmen.

Around January of 1980, certain citizens of Crockett began questioning the adequacy of Chief Irvin's performance at the helm of the department, the subject having been later discussed at a number of City Council meetings in the first few months of 1980. Among those who took occasion to criticize the Chief were three Crockett policemen, Sergeant David Lamb, Investigator William Clary, and Patrolman James Saduske. At various times, singly and collectively, the three spoke informally with several City Council members about difficulties in the Police Department, mentioning equipment shortages, personnel policies, and what they considered to be Chief Irvin's mishandling of his duties.

On June 16, 1980, Chief Irvin learned from Elmer Murray, a City Councilman, of the conversations which had transpired between the three officers and Council mem-

bers and of the criticisms the officers had put forward. Later that same day, he decided to dismiss the three from the police department. The named officers' employment was officially terminated on June 20, 1980. They have now filed suit in this court, claiming a violation of their rights under the First Amendment to the Constitution, and seeking relief in vindication thereof.[1]

■ Two analytical steps are required to assess the merits of this lawsuit. The first is to identify what conduct on the part of the plaintiffs actually led to the dismissals. The second is to determine whether that activity is protected by the First Amendment. Constitutionally protected expressions may not form the basis for a dismissal, unless the employee would have been discharged even in their absence. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 478 (1977).[2]

In the first step of the analysis, *Mt. Healthy* dictates a test which looks toward the subjective intentions of the employer, not to the objective reasonableness of whatever additional grounds for discharge may exist. The Supreme Court's own language makes this clear, for in *Mt. Healthy* it is said that the employee must first prove that the expression played a "substantial" or "motivating" part in the termination decision; the burden then shifts to the employer to demonstrate "that it *would* have reached the same decision ... even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. at 576 (emphasis add-

ed). Similarly, in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979), the Court noted that the test was whether the employee would have retained her position *"but for"* the protected speech.

■ The plaintiffs have clearly shown that their communications with City Council members were a motivating factor in the discharges. According to Chief Irvin's own testimony, he felt the three officers, by communicating with the City Council members, were seeking to undermine his authority and secure his dismissal. This, in his view, was reason enough to sever their employment with the city. In fact, it was shortly after his June 16 conversation with Councilman Elmer Murray that Chief Irvin made the determination to remove the plaintiffs from the ranks of the Crockett Police Department. On June 18, he met with the plaintiffs to inform them of his decision, unequivocally stating that their series of talks with City Council members was the main reason for the dismissals.

The defendants have advanced supplementary justifications for the discharges, attempting to fulfill their subsequent burden of proving that the plaintiffs would have been fired even in the absence of their conversations with the City Council members. However, none of the additional explanations and rationalizations appear to have played any real part in the Chief's actions. First, when Chief Irvin informed the plaintiffs of his decision to terminate them, he also mentioned certain complaints from citizens about their performance as

---

1. The plaintiffs also allege the denial of rights under the due process clause of the Fourteenth Amendment and various state constitutional and statutory provisions. Because of the disposition of their First Amendment claim, those contentions need not be addressed.

   The evidence in this case was heard on a motion for preliminary injunction. The plaintiffs moved for advancement of the trial on the merits to coincide with the preliminary injunction hearing. The defendants having indicated no opposition to the motion, the court has granted it and now decides this case on the merits (Rule 65(a)(2), Federal Rules of Civil Procedure), with the exception of the plaintiffs' claims for damages. The latter have been sev-

ered by court order from the claims for equitable relief.

2. Whether a discharged employee has a Fourteenth Amendment property interest in his or her job is irrelevant for purposes of the First Amendment. "Even though [an employee] could have been discharged for no reason whatever, and had no constitutional right to a hearing prior to the [termination] decision ... he may nonetheless establish a claim to reinstatement if the decision ... was made by reason of his exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy*, 429 U.S. at 283–284, 97 S.Ct. at 574.

policemen. On that occasion, he hinted that the complaints formed a part of the basis for the firings. Nonetheless, Chief Irvin had known of the complaints for some time, and had never seen fit to dismiss or discipline any of the three officers concerning matters encompassed in the citizens' grievances, until he learned of their conversations with the City Councilmen. Indeed, the accusations of the citizens notwithstanding, the Chief had occasionally complimented officers Lamb and Clary on their job performance and, at one time or another, had declared that each of the three plaintiffs might be promoted in rank. In his testimony, moreover, Chief Irvin expressed the opinion that all three plaintiffs were capable of good police work.

Additionally, some testimony in evidence indicated that a few members of the general public may have overheard the plaintiffs' criticisms of Chief Irvin. While there is nothing in the record that suggests frequent airing of the plaintiffs' complaints to the general public, the defendants have made much of the allegation that these three officers pilloried the Chief of Police in front of the community. Even if the evidence supported such a proposition–and it does not appear to have done so–it is unlikely that Chief Irvin was motivated by any of plaintiffs' communications with the

public at large when he terminated their employment.[3] He did not mention these utterances to the plaintiffs in notifying them of their discharge, nor did he make reference to the criticisms in his trial testimony.

Finally, the defendants presented evidence to the effect that the plaintiffs criticized Chief Irvin in the presence of other officers on the force, and that this reprobation may have generated an atmosphere of tension and a decline in general efficiency within the department. However, the Chief did not allude to any of these matters when he informed the plaintiffs of their dismissals, specifying only the communications to members of the Council and the complaints of citizens.[4] Similarly, in his trial testimony, the Chief did not delineate the plaintiffs' communications with other members of the force as one of the factors which prompted him to terminate the three.[5]

It appears, then, that the plaintiffs would not have been dismissed from their employment, except for their communications with members of the Crockett City Council. This leads to the second step of the analysis to be performed: whether the communications themselves are protected by the First Amendment.[6]

**3.** Even if the Chief had been so motivated, it is entirely possible that the public criticisms would be protected by the First Amendment. Because it is found that public criticisms did not play a part in the Chief's decision, the constitutional parameters relating to them need not be addressed.

**4.** Furthermore, the Chief failed to take any prior action regarding what he considered a decline in efficiency among the patrolmen in general. He testified that part of this retrogression became manifest through reductions in the frequency of traffic violation citations and misdemeanor arrests. The records of the department show that the significant reductions in those areas first occurred in December of 1979 and January of 1980 (five to six months before the plaintiffs were fired). Officer Lamb testified that they were not the result of declining morale, but occurred because of a decision among the shorthanded patrol force to put less emphasis on minor violations.

**5.** Even if the conversations with other members of the force were significant factors in Chief Irvin's decision, the fact that stresses and strains were thus created within the department does not, of itself, justify the dismissals. Any criticism of the upper echelon of a governmental institution may create tensions within that institution. See *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Also, whether tension–producing or not, the conversations with other policemen may well be protected by the First Amendment. See *Flynn v. Giarrusso*, 321 F.Supp. 1295 (E.D.La. 1971). Since they were not included as part of the basis inducing the Chief's decision, that legal issue need not be given consideration.

**6.** Defendants assert that the three officers violated department regulations 6.04 (relating to "insubordination") and 10.20 (relating to "subversive acts") by criticizing the Chief in front of City Council members. Because of the First Amendment analysis of the individual commu-

The Constitution's guarantee of freedom of speech in many ways symbolizes its inherent proposition that public officials are not entitled to blind, uncritical adherence. The opportunity for the People freely to speak and criticize those in positions of governmental power lay near the hearts of the framers of the Constitution. This opportunity is not necessarily withheld from governmental employees; the Supreme Court has held that the mere fact that strictures may be directed toward a supervisor by a subordinate public employee does not eliminate the First Amendment's protection of the critical speech. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[7] Thus it is that public employees, including the plaintiffs in this case, possess the same interests that any citizen would have in commenting on matters of public concern–here, the performance of a public official, the Chief of Police. *Id.*, 391 U.S. at 568, 88 S.Ct. at 1734.

But there is an additional interest to be considered: that of the plaintiffs, as peace officers and members of the Crockett Police Department, in communicating their disquietudes and professional concerns about its chief official to those possessed of the power to remedy the disturbing matters.[8] As providers of a public service, the officers had the prerogative, even the duty, to comment on the quality of that service when trying to improve it. This interest received recognition in *Givhan v. Western Line Consolidated School District*, 439 U.S. at 415–416, 99 S.Ct. at 696–697, where the Supreme Court acknowledged a public employee's right to communicate privately with superiors about matters relating to the public

institution for which the employee works. Similarly, in *Pickering*, the Court, invalidating the dismissal of a teacher for publicly criticizing the school district's expenditures of education funds, noted that teachers had peculiar knowledge and expertise in the spending of school monies. "Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S. at 572, 88 S.Ct. at 1736. The United States District Court for the District of Rhode Island outlined the same First Amendment interest: "Is it too much to recognize ... that members of a profession have, as a matter of conscience, commitments to standards and philosophies of practice; and that, at least without clear agency rules to the contrary, they may not be disciplined for expressing the dictates of their professional conscience?" *Pilkington v. Bevilacqua*, 439 F.Supp. 465, 479 n. 11 (D.R.I.1977), *aff'd* 590 F.2d 386 (1st Cir. 1979).

Of course, the plaintiffs, as police officers, have no legally cognizable interest in recklessly or knowingly spreading false and defamatory allegations about the Chief of Police. *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737. Here, there is no evidence that they did so. Their remarks to City Council members related to a lack of concern on the Chief's part about equipment shortages, personnel problems, and the practical difficulties facing the patrolmen on their beats. They also made statements expressing the opinion, in substance, that it was not the Chief but officers Clary and Lamb who actually operated and directed the police department; that the Chief was not intelligent enough to handle the job.[9] These

---

nications involved in this litigation, as well as the disposition of the parties' claims in this memorandum opinion, no need exists to address the issues of vagueness and overbreadth with respect to the two departmental regulations.

**7.** The fact that the conversations at issue were private rather than public does not automatically eject them beyond the reach of the First Amendment. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

**8.** It is important to note that it is the City Council which has direct authority over the Chief of Police. It is the only body with the power to dismiss him.

**9.** The latter comment, along with the occasional use of a nickname when referring to the Chief, reflects a regrettable lack of tactfulness on the part of the plaintiffs. But the First Amendment is not exclusively reserved for polite and tactful utterances, and the plaintiffs' shortcomings in this respect do not necessarily lead to the dissipation of the right of free speech. *Terminiello v. Chicago*, 337 U.S. 1,

statements appear to reflect what the three officers truly believed, based on their experiences in the Crockett Police Department, and also seem to have been expressed in an effort to upgrade the Department and improve on a less than perfect state of affairs in the management of the police force.[10] Nothing about the statements serves to indicate that they were made . maliciously, recklessly, or with knowing falsehood.

Recognition of the plaintiffs' right of comment and criticism does not end the matter, for "the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of speech of the citizenry in general." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. Thus, "[t]he problem in any case is to arrive at a balance between the interests of the [employee] in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Id.*

Nothing in the record compels the conclusion that the promotion of general efficiency within the Crockett Police Department or the job performance of the three individual plaintiffs suffered as a result of their communications with members of the City Council. Chief Irvin testified that he felt efficiency had declined because the plaintiffs had talked about their grievances with other policemen; it has already been observed, however, that those particular conversations were not the basis for the terminations. Moreover, the Chief had, on several occasions, praised the individual job performances of the plaintiffs and stated that he believed the three to be capable of good police work.[11]

The state's concern with efficiency clearly extends to the maintenance of harmony in close working relationships. As the Supreme Court noted in *Pickering*:

It is possible to conceive of some positions in public employment in which the need for confidentiality is so great the even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of ... criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

Nothing inherent in the general nature of employment within a police department predetermines that all relationships will be in need of confidentiality or the avoidance of criticism. "The fact that [someone] is a policeman and, as such, a public employee, does not, in itself, muzzle him from criticizing the police department." *Flynn v. Giarrusso*, 321 F.Supp. 1295, 1298 (E.D.La.1971). Nor does the size of the Crockett Police Department dictate total silence within its ranks. While it is very small and the officers are in much more day–to–day contact with each other–and, presumably, the Chief of Police–than in a larger, more bureaucratized department, that fact alone cannot suffice to limit the First Amendment's protection. It would obviously be wholly inequitable to preserve the right to criticize for public employees in large cities, yet dispense with it for all who work for govern-

---

4–5, 69 S.Ct. 894, 895–896, 93 L.Ed. 1131 (1949).

**10.** One factor which demonstrates that the criticisms of Chief Irvin were not falsely or recklessly made lies in the fact that the City Council had independently raised questions about the adequacy of the Chief's performance of his duties.

**11.** *See generally, Jannetta v. Cole*, 493 F.2d 1334, 1337 (4th Cir. 1974), where the Court of Appeals for the Fourth Circuit affirmed the district court's finding that there had been no showing of significant interference with the efficiency of a fire department's operations by the circulation of a petition and, therefore, that the dismissal of the fireman who helped circulate the petition contravened the First Amendment.

ment in the many small cities and towns in this nation. Just as there is a right to, and a legitimate need for, criticism of government from within its own ranks in such metropolitan areas as Washington, D.C., and Austin, Texas, so is there the same liberty, license, and necessity in the municipalities lying within the Piney Woods of East Texas.

The particular working relationships involved in this case remain to be considered. Of the three plaintiffs, Sergeant Lamb, as the second ranking person on the force, stood closest to the Chief. Nevertheless, that relationship does not appear to be of the type to call for Lamb's holding back from faultfinding or for total confidentiality relating to their professional dealings. First of all, Sergeant Lamb's main duty was the supervision of the patrolmen, which was clearly distinct from Chief Irvin's management and administrative responsibilities. Second, Sergeant Lamb made his decisions regarding day–to–day operations of the patrolmen independently of Chief Irvin, seeking the latter's guidance only on matters of major policy. Third, the two officers worked different hours and were simultaneously on duty for only four or five hours a day. In sum, close and frequent contact was not a necessary part of the working relationship between them, and their respective positions covered distinct subject–matter responsibilities. Thus, their situation is not analogous to that of, for example, a President and his personal adviser, where utter silence and confidentiality would be necessary concerning the matters with which they deal.

Less difficult is the resolution of Officer Clary's status. He was the only investigator and also the third ranking policeman on the force, subordinate to the Chief and Sergeant Lamb. His duties as investigator were apparently separate and apart from Chief Irvin's executive and supervisory obligations and could be adequately performed without entire secretiveness relating to, or abstinence from, all censorious critiques of professional operations.

Finally, Officer Saduske was one of the six patrolmen who reported directly to Sergeant Lamb. To all appearances, little personal or intimate contact existed between Chief Irvin and Saduske. The officer's assignment thus carried with it no obligation, in ordinary circumstances, to eschew criticism of the Chief or to be taciturn about their limited associations.

In balancing the relevant interests of efficiency and harmonious working relationships, it should be noted that the communications for which the three were terminated were made privately to City Council members. That they were private does not, of course, make the conversations any less deserving of First Amendment protection. *Givhan v. Western Line Consolidated School District*, 439 U.S. at 415–416, 99 S.Ct. at 696–697. In reality, the privacy of the conversations militates in favor of the discharged employees. Manifestly, much less of a strain on departmental efficiency and harmony was occasioned by the plaintiffs' uttering their grievances privately to concerned and authoritative parties than broadcasting them to the community through the media. This case is thus markedly unlike *Magri v. Giarrusso*, 379 F.Supp. 353 (E.D.La.1974), where the court upheld the discharge of a police officer who carried on a campaign of public criticism directed against the police superintendent. His activities involved sending hundreds of letters to the local press, habitual holding of press conferences, issuing press releases, and appearing on television and radio. The officer publicly referred to the superintendent as a "coward" and a "liar." When confronted with these circumstances, the court held:

It hardly needs pointing out that the superintendent needs the confidence and loyalty of his men in order to run an effective police department, in order to maintain an efficient and disciplined force. [The officer's] insubordinate remarks, bordering on the defamatory, worked to destroy this relationship between the Superintendent and his men .... This Court would have recognized, and, indeed, encouraged responsible public criticism of the superintendent's poli-

cies .... But that does not include vitriolic remarks which the Court finds threatened significant working relationships vital to the administration of the police department.

379 F.Supp. at 361. In the instant case, conversely, the communications for which the plaintiffs were discharged occurred privately and were not of the exceedingly frequent, vitriolic, and near–defamatory nature of those in *Magri*. The private talks with City Council members in Crockett were calculated to have little, if any, effect on significant working relationships, in extreme contrast to what the court found in *Magri*.

The present situation is more akin to that in *Castleberry v. Langford*, 428 F.Supp. 676 (N.D.Tex.1977), where the court found a First Amendment violation despite the fact that the suspended firefighter had privately criticized the Fire Chief to other city officials.

At trial, there were references to statements of a disrespectful nature that Plaintiff had made about the Fire Chief. The evidence indicates, however, that such statements were made in private conversations when Plaintiff was endeavoring to present grievances on behalf of [the firefighters association] members. There is no allegation of any statement similar to that cited in *Kannisto v. City and County of San Francisco*, 541 F.2d 841 (9th Cir. 1976), where a police officer made disrespectful and disparaging remarks about a superior officer during a morning inspection. Rather, Plaintiff Castleberry apparently made his remarks during private meetings. There is no claim that Plaintiff at any time refused to obey orders or even that he was disrespectful or insubordinate while going about his duties as a firefighter.

428 F.Supp. at 682.

The final factor to be considered involves the defendants' asserted interest in preserving the chain of command within the Crockett Police Department. Insisting that officers should make their complaints within the department, to the Chief, they maintain that the plaintiffs were not entitled to "go around" him to other city officials. However, this chain of command was certainly not formalized, and no officialism existed as to it. Further, no evidence was offered that orders were ever given forbidding policemen to talk to City Council members. Indeed, the lack of formal procedures is illustrated by the fact that it was occasionally some of the members of the City Council who took the initiative in the irregular, *ad hoc* communications, by coming to Officers Lamb and Clary to discuss departmental problems. The state of affairs at Crockett was thus similar to those involved in *Jannetta v. Cole*, 493 F.2d 1334, 1337 (4th Cir. 1974), and *Castleberry v. Langford*, 428 F.Supp. at 678–681. In each of those cases, fire department members presented grievances to city officials without first discussing them with their superiors. Both courts held that the willingness of the city officials to allow such communications constituted an informal "open door" policy, which existed as a viable alternative to the chain of command. Furthermore, it is to be noted that the plaintiffs in the case at hand did not flaunt whatever chain of command may have existed, since they took most of their complaints about the department to Chief Irvin—excluding personal criticisms of him—before mention of them was made to the City Council members. Clearly, any transgressions of the chain of command that did take place were not seriously disruptive of existing practices within the governmental structure of the City of Crockett.

In conclusion, it appears that the Crockett Police Department's concerns with efficiency and harmony, while legitimate, were not so hampered by private criticisms of the Chief of Police to City Council members as to move those criticisms beyond the pale of the First Amendment and to justify the punishment of their utterance with retaliatory dismissal.

### Relief

■ The plaintiffs are clearly entitled to an award of back pay, less interim earnings, as partial relief for their unconstitutional

dismissals. *See Kingsville Independent School District v. Cooper*, 611 F.2d 1109, 1114 (5th Cir. 1980); *Whiting v. Jackson State University*, 616 F.2d 116, 122 n. 3 (5th Cir. 1980) (An award of back pay pursuant to 42 U.S.C. § 1983 is equitable rather than legal in nature.).

Reinstatement as a remedy presents a more difficult question. While it has been found that the plaintiffs' communications with City Council members did not significantly threaten the harmony of their working relationships with the Chief, there is little doubt that personal tension runs high between them. This level of disaccordance may have arisen from the oversensitivity of the parties, and from the natural feelings of embitterment that accompany litigation of this description. Likewise, the Chief of Police, on the one hand, and the three plaintiffs, on the other, seem to entertain feelings of mutual distrust, because of the events which have transpired.

Reinstatement, however, is normally an integral part of the remedy for a discharge which contravenes the First Amendment. The remedy is not to be precluded, according to the Fifth Circuit, simply because its implementation will generate tension and difficulty. In *Sterzing v. Fort Bend Independent School District*, 496 F.2d 92 (5th Cir. 1974), the district court found that a schoolteacher had been discharged in violation of his rights under the First Amendment, yet denied his request for reinstatement on the grounds that it would revive antagonisms. On appeal, the Fifth Circuit said: "In declining to grant reinstatement on the basis that it would be too antagonistic, the Court used an impermissible ground .... [T]he Court could not deny relief on such basis. Enforcement of constitutional rights frequently has disturbing consequences. Relief is not restricted to that which will be pleasing and free of irritation." 496 F.2d at 93. Accord: *Jan-netta v. Cole*, 493 F.2d 1334, 1338 (4th Cir. 1974) ("[T]he remedy for constitutionally impermissible discharge from public employment is back pay and reinstatement."); *Guerra v. Roma Independent School District*, 444 F.Supp. 812, 821 (S.D.Tex.1977) (Gee, Circuit Judge) ("[W]here a teacher's first amendment rights have been violated the court may not refrain from reinstating him merely because reinstatement would revive old antagonisms."). Therefore, reinstatement will be ordered as to the three plaintiffs.

Finally, reasonable costs and attorney's fees will be awarded.[12]

---

12. 42 U.S.C. § 1988 (Civil Rights Attorneys Fees Awards Act of 1976). Uncontradicted testimony at the hearing in this civil action indicated that, in this locality, a reasonable rate for a lawyer's services in a case of this nature would be $75.00 per hour, out of court, and $750.00 per trial day. Using these figures, plaintiffs should submit their claim for attorney's fees and costs to the defendants. If some contest over the ultimate amounts should arise, it will be adjudicated at the proper time.