**Eugene F. SALERNO, Plaintiff,**

v.

**Thomas J. O'ROURKE, Individually and in his capacity as Camden County Sheriff; Joseph Borreggine, Eugene Feldman, Michael J. Hayes, Joseph Milano, Hillard T. Moore, Sr., Edward W. Sayers, William J. Simon, Individually and in their capacity as members of the Camden County Board of Chosen Freeholders, Defendants.**

Civ. A. No. 79–3234.

United States District Court,
D. New Jersey.

Jan. 18, 1983.

Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N.J., by Ronald A. Graziano, Haddonfield, N.J., for plaintiff.

Stephen D. Weinstein, County Counsel, Camden, N.J., by Vincent J. Paglione, First Asst. County Counsel, Camden, N.J., for defendants.

## OPINION

COHEN, Senior District Judge:

Plaintiff, Eugene F. Salerno, a Deputy Warden employed by the County of Cam-

den, County Jail Division, instituted this civil rights action alleging that defendant, each acting in his official capacity, deprived him of freedom of speech and due process as guaranteed by the First, Fifth, and Fourteenth Amendments to the United States Constitution. Specifically, plaintiff claims: (1) that he was not accorded the duties, powers, shift rotation and other indicia of a Deputy Warden, in violation of the substantive and procedural due process protections afforded him by the Fourteenth Amendment; and (2) that the Camden County Sheriff's Department Rules and Regulations, under which he was disciplined, are facially overbroad and therefore invalid under the First and Fourteenth Amendments.[1] He seeks a preliminary and permanent injunction barring defendants, their agents, employees and successors from continuing the alleged pattern and practice of harassment against him. Additionally, he seeks compensatory damages for the alleged deprivation of his constitutional rights, for his lost earnings, lost sick leave, lost retirement contributions, and for the humiliation, embarrassment, and loss of reputation as a public employee he suffered.[2]

Jurisdiction is based on Section 1343(3) of Title 28 of the United States Code, Section 1983 of Title 42 of the United States Code, and the First, Fifth, and Fourteenth Amendments to the United States Constitution.

A non-jury trial was held in this matter. At the close of plaintiff's case, defendant members of the Camden County Board of Chosen Freeholders[3] moved to dismiss the entire Complaint as to them, on the ground that plaintiff failed to raise a colorable claim against them. In addition, defendant O'Rourke moved to dismiss certain specific allegations contained in Count 3 of plain-

---

1. Count 4 of plaintiff's initial Complaint additionally alleged that defendant O'Rourke discriminated against him in part because of his national origin, in violation of his Fourteenth Amendment rights. Counsel for plaintiff stipulated to the dismissal of Count 4 at the close of plaintiff's case. (Tr. 144).

2. Plaintiff additionally sought punitive damages in his Complaint. However, this claim was withdrawn at trial. (Tr. 3–4).

3. The Board of Chosen Freeholders is the governing body invested with the legislative power of Camden County. N.J.Stat.Ann. § 40:41A–79 (West Cum.Supp. 1982–83).

tiff's Complaint for lack of evidence.[4] These oral motions were taken under advisement by the Court, (Tr. 145), pursuant to Fed.R.Civ.P. 7(b)(1), and defendants were permitted to present their case. This Opinion is written in lieu of findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

## FACTUAL BACKGROUND

At all times pertinent to this action, plaintiff was employed as a Deputy Warden by the County of Camden. His employment commenced on April 5, 1966 as a Corrections Officer, and he became a permanent employee on October 20, 1967. During his seventeen years with the Sheriff's Department, plaintiff passed competitive examinations for and was promoted to the positions of Camden Corrections Sergeant, Sheriff's Officer Sergeant, Sheriff's Officer Lieutenant, Sheriff's Officer Captain, and, finally, to his present position as Deputy Warden. In addition, plaintiff served as Undersheriff from November 1974 to February 1976. (Tr. 7–9).

Plaintiff's duties as Deputy Warden were to assist the Warden in managing the county jail, in both an administrative and policy-making capacity. (Tr. 17). During his years of service with the Sheriff's Department, he received several departmental awards and honors and, with one exception, obtained the highest performance rating possible each time he was evaluated. (Tr. 11–12).

Defendant O'Rourke served as Sheriff of Camden County from September 1976, when he was appointed by the Governor,[5] until his elected term expired in 1980. (Tr. 146). Plaintiff unsuccessfully opposed O'Rourke as a candidate for the position of Sheriff in the general election in November 1976. (Tr. 13). In addition, both men were successful candidates for Sheriff in the primary elections of 1979, plaintiff on the Republican ticket, and defendant on the Democratic slate.[6] (Tr. 113).

Prior to the November 1976 election won by Sheriff O'Rourke, plaintiff was exclusively assigned to the day shift, 8 a.m. to 4 p.m., and his place of work remained constant. After the 1976 election, however, he was reassigned to the 4 p.m. to midnight shift, and, in 1979, he experienced additional changes, to the 3 p.m. to 11 p.m. and 11 p.m. to 7 a.m. shifts, and changes in his place of work from the main jail in Camden City, where he had been exclusively assigned, to the Lakeland annex, in Camden County, (Tr. 35–37), approximately twelve miles from the main jail.

In December 1976, defendant O'Rourke appointed plaintiff to a newly-created position, Staff Inspector, (Tr. 19), which he held concomitantly with his position as Deputy Warden. As Staff Inspector, plaintiff reported directly to Sheriff O'Rourke, whereas in his capacity as Deputy Warden, he reported to the Warden. Plaintiff's primary duties as Staff Inspector were to make inspections of the jail personnel and facilities, and provide the Sheriff with status reports. His position as Staff Inspector was terminated by O'Rourke in March 1977, after he submitted a report to him alleging overtime abuses and double salaries, and recommending the implementation of various personnel systems to increase efficiency and cut down on waste and abuse of department funds. Thereafter, he was returned full time to his present position and title as Deputy Warden. (Tr. 19–22).

4. Defendants moved to dismiss plaintiff's claims "that he had been compelled to report to individuals equal to or below him in the chain of command, [that he had] been denied the opportunity to perform his duties properly, and [that he had] been denied access to defendant [O'Rourke]." (Tr. 144).

5. Sheriff O'Rourke testified at trial that he was appointed by the Governor to succeed another interim appointee, Sheriff Loomis. (Tr. 146). The Governor is empowered to make such appointments pursuant to N.J.Stat.Ann. § 40A:9–102 (West 1980).

6. Shortly after the primary, Sheriff O'Rourke announced his retirement from office. (Tr. 173). On January 1, 1980, he was succeeded by William Simon, who was elected as Sheriff in November 1979, after replacing O'Rourke as the Democratic candidate for that office. (Tr. 173).

Plaintiff became increasingly concerned that he was not being accorded the responsibilities and duties of his position as Deputy Warden, and, in February 1979, he requested a review by the Civil Service Commission (Commission) of the job he was performing. (Tr. 37). The Commission conducted concurrent audits of both plaintiff's position and the position of his co-Deputy Warden, John Carroll, and critically concluded that although Carroll's duties were commensurate with his position, the duties plaintiff was being permitted to perform were equivalent to the lesser position of Captain. The Commission's report was submitted to Sheriff O'Rourke on May 4, 1979. Nevertheless, plaintiff's responsibilities and duties remained as they were prior to the Commission's audit and report. (Tr. 37–38).

On March 22, 1979, plaintiff received a Notice of Minor Disciplinary Action which suspended him for four days without pay. This disciplinary action was based on three incidents in which Sheriff O'Rourke accused plaintiff of being insubordinate and uncooperative: (1) a discussion between plaintiff, O'Rourke, and two other Sheriff's Department employees in which O'Rourke interpreted a remark by plaintiff that O'Rourke's election efforts resembled those of a perennial candidate named Moffa to be an insulting reference to Jimmy Hoffa (Tr. 24–27); (2) a series of communications during the fall of 1978 and early 1979 in which O'Rourke claimed that the plaintiff misinformed the Sheriff's Department of the cause of a back injury which resulted in plaintiff's absence from work for a period of time (Tr. 27–29; Tr. 208); and (3) plaintiff's alleged failure to complete a new personnel questionnaire. (Tr. 170–72).

During the four-day suspension period, two additional incidents relevant to the instant action occurred. First, plaintiff received a hand delivered letter on March 29, 1979 from defendant O'Rourke ordering him to submit, within twenty-four hours, "a written report setting forth all facts within your knowledge concerning the pending investigation of allegations by Yvonne Sturtevant," (Tr. 44), an inmate, whose accusa-

tions that several employees of the Camden County Jail were guilty of sexual misconduct were under investigation by the County Prosecutor and the Sheriff's Department. (Tr.167). Plaintiff responded to defendant O'Rourke's request in writing the following day, as ordered, notifying defendant that the alleged misconduct occurred while plaintiff was not on duty, and therefore, he had no detailed knowledge of it. (Tr. 48). The next day, plaintiff received a telephone delivered telegram from an apparently dissatisfied Sheriff O'Rourke, notifying him that unless he "fully compl[ied]" with the terms of the March 29, 1979 order, he would be suspended from duty without pay. (Ex. P–32). The telegram further ordered that plaintiff report to O'Rourke's office on April 2, 1979 for an interview. (Ex. P–32).

On April 2, 1979, plaintiff reported to O'Rourke who told him that "he'd be right with [him]." (Tr. 57). Plaintiff then was approached by an Internal Affairs Unit Officer for an interview. Plaintiff refused to be interviewed by the Officer, on the ground that earlier that day, counsel for both plaintiff and defendant had agreed that the meeting was to be solely between plaintiff and O'Rourke, (Tr. 59), and on the ground that O'Rourke never ordered plaintiff to speak with Internal Affairs. (Tr. 58).

Plaintiff next reported for work on April 9, 1979, after receiving a telephone call from Undersheriff Gass instructing him to do so. (Tr. 60). On April 10, 1979, he received a Notice of Minor Disciplinary Action retroactively suspending him from April 2 through April 6, 1979. (Ex. P–38). Plaintiff at that time had not and to this date has not been provided with charges which specifically relate to the five-day suspension. (Tr. 61). In addition to the above Notice, plaintiff also received a Preliminary Notice of Disciplinary Action with two pages of charges and specifications attached. This Notice called for removal as the penalty. (Ex. P–39). On April 12, 1979, plaintiff received a second Preliminary Notice of Disciplinary Action, which

again called for removal as a penalty. (Ex. P–41).

On April 22, 1980, Departmental Hearings were held on the above charges. At that time, counsel for the Sheriff's Department stipulated that the charges were precipitated by the "Carney letter" incident. (Tr. 142). The "Carney letter," published in the March 19, 1979 edition of the *Camden Courier-Post,* was a letter written by Sheriff's Officer Edward Carney, expressing concern by several officers in the Sheriff's Department that the Sturtevant investigation was being mishandled. (Tr. 191). The letter also expressed dissatisfaction with prior press coverage of the incident—a press release jointly issued by the Prosecutor and defendant O'Rourke, and an article which appeared in the *Courier-Post* seven to ten days before the "Carney letter" was published in the same newspaper. (Tr. 180). The officers contended that such press coverage was detrimental to the morale and reputation of both the Sheriff's Department and its individual officers. (Tr. 54).

Sheriff O'Rourke accused plaintiff of improperly participating in the "Carney letter" incident. (Tr. 166–67). Plaintiff did not author the "Carney letter." He edited it for spelling and grammatical errors, typed it, and provided a copy to a news reporter, all at Officer Carney's request. (Tr. 52). It is of some significance that although defendant O'Rourke stipulated that the disciplinary actions taken against plaintiff arose out of and were precipitated by the "Carney letter", (Tr. 142), no disciplinary actions of any kind were taken against Officer Carney for his participation in the incident. (Tr. 64).

As a result of the disciplinary actions referred to above, plaintiff lost sixty-five days of pay, six days of leave, and public employee retirement account contributions for the sixty-five day period, all of which form the basis of his claim for compensatory damages.

## I. CAUSE OF ACTION AS TO DEFENDANT BOARD OF CHOSEN FREEHOLDERS

To establish a claim under 42 U.S.C. § 1983, plaintiff must satisfy a two-prong standard: first, that he was deprived of a right secured by the Constitution or laws of the United States; and second, that the defendants who allegedly deprived him of that right were acting under color of state law at the time the alleged constitutional violation occurred. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Reid v. Barrett,* 467 F.Supp. 124, 126 (D.N.J.1979), *aff'd,* 615 F.2d 1354 (3d Cir.1980). Plaintiff's satisfaction of the first prong is not in dispute. His Complaint alleges specific and cognizable violations of his right to freedom of speech, guaranteed by the First Amendment of the United States Constitution, and his right to substantive and procedural due process guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution.[7] *Rodes v. Municipal Authority of the Borough of Milford,* 409 F.2d 16, 17 (3d Cir.) (per curiam), *cert. denied,* 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 114 (1969).

As to the second prong, the Supreme Court has held that state officers and employees are found to be acting under color of state law when their actions are in fulfillment of tasks and obligations assigned to them, or made possible by the power conferred upon them by the government. *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Defendant O'Rourke does not dispute that each time he took disciplinary action against plaintiff, he was acting in his official capacity pursuant to the mandate of the State of New Jersey, as set forth in N.J.Stat.Ann. § 40A:9–44 to 117 (West Cum.Supp. 1982–83), which creates and governs the position

---

**7.** Plaintiff's Complaint alleges violations of his rights to both procedural and substantive due process. As the Supreme Court has stated, the United States Constitution "affords not only a procedural guarantee against the deprivation of 'liberty', but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State." *Kelley v. Johnson,* 425 U.S. 238, 244, 96 S.Ct. 1440, 1444, 47 L.Ed.2d 708 (1976). Accordingly, plaintiff's procedural and substantive due process claims will each be addressed in turn.

of Sheriff. Therefore, this Court finds that at all times pertinent hereto, defendant O'Rourke was acting under color of state law, and plaintiff has satisfied the second prong of the § 1983 standard as to him.

The issue remains, however, whether plaintiff has satisfied the second prong as to defendants Joseph Borreggine, Eugene Feldman, Michael J. Hayes, Joseph J. Milano, Hillard T. Moore, Sr., Edward W. Sayers, and William Simon, individually and in their capacities as members of the Camden County Board of Chosen Freeholders (Freeholders). For the reasons set forth below, this Court finds that plaintiff has failed to meet his burden of proof, and his Complaint as to the above named defendants shall be dismissed.

The gravamen of plaintiff's Complaint is that although he communicated to defendant Freeholders the various problems and complaints he had with his treatment by Sheriff O'Rourke, they failed to take remedial action, thereby adopting O'Rourke's conduct as their own policy. He offers as evidence these communications: (1) a letter dated February 2, 1979 from plaintiff to Civil Service Personnel regarding an audit request, with copies to the County Administrator and the Freeholders (Ex. P–20); (2) a letter dated February 5, 1979 from plaintiff to the County Administrator and the Freeholders, complaining of ridicule and demeaning conduct (Ex. P–21); and (3) a letter dated May 8, 1979 from plaintiff to defendant O'Rourke, complaining that he was not being accorded all the powers and duties of a Deputy Warden, with a copy to the County Administrator. (Ex. P–44).

Plaintiff's argument implies that upon receipt of the above communications, the members of the Board of Chosen Freeholders had an affirmative duty to act. However, he offers no legal support for this proposition.[8] An independent review of the applicable statute establishes that although the Board of Chosen Freeholders has the power to express disapproval of the suspension or dismissal of county employees, it does not have an *obligation* to do so. *See* N.J.Stat.Ann. §§ 40:41A–66 and 41A–87 (West Cum.Supp. 1982–83). Moreover, even if plaintiff could establish that such a legal duty exists, he still fails to show that he complied with the appropriate statutory procedures for notifying the Board of Chosen Freeholders that he was wrongfully suspended. *Id.* at § 40:41A–87.

Acts of omission can be cognizable under § 1983. *Santiago v. City of Philadelphia,* 435 F.Supp. 136, 152 (E.D.Pa.1977). However, relief is not obtainable against supervisors "unless they have participated in the offending conduct or have knowledge of and acquiesced in the constitutional deprivation." *Id.* at 151; *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). Moreover, officials can be held liable for the misconduct of their subordinates only if they have an affirmative duty to investigate their subordinates' action. *Santiago,* 435 F.Supp. at 152; *see also Hupart v. Board of Higher Education of City of New York,* 420 F.Supp. 1087, 1109 (S.D.N.Y.1976).

In a § 1983 action, plaintiff bears the burden of establishing that defendants deprived him of constitutional rights as charged in the complaint. *Whitsel v. Southeast Local School District,* 365 F.Supp. 312, 314 (D.C.Ohio 1972), *aff'd,* 484 F.2d 1222 (6th Cir.1973). In the case at bar, plaintiff's Complaint as to the Freeholders fails to establish the nature of the relationship between them and defendant O'Rourke. Without a showing that a supervisory relationship exists between defendants, this Court is unable to find that the Freeholders' failure to take remedial action against O'Rourke is cognizable under § 1983.

---

8. Plaintiff's counsel stated at trial that plaintiff's "entire case" against the named members of the Board of Chosen Freeholders was premised on the theory that they "have the power of [the] purse over the Sheriff ...."

(Tr. 143). However, neither the papers submitted to this Court by plaintiff nor the evidence proffered by him at trial provide any legal support for this rather vague assertion.

Assuming, however, that the requisite supervisory relationship exists, plaintiff's Complaint still fails to establish that the Freeholders participated in the alleged unconstitutional actions, or that they had "knowledge of and acquiesced in" those actions, within the meaning of *Santiago.* Plaintiff appears to argue that the knowledge and acquiescence standard is met by the three written communications offered into evidence. Although these communications may establish knowledge, plaintiff's failure to show that the Freeholders had *direct* supervisory control over Sheriff O'Rourke triggers a stricter standard of scrutiny which his Complaint cannot withstand:

> [I]n situations where an official has direct supervisory control over persons committing the alleged violations, the supervisor's general knowledge of the situation triggers an affirmative duty to investigate further.... In contrast, when liability is sought against higher officials who have less direct supervisory control, general knowledge of misconduct and a failure to act will not suffice to prove that these superiors were responsible for the deprivation of rights by subordinates. In these situations in order to justify relief against these defendants, the plaintiff must show specific knowledge of the misdeeds and specific evidence of approval or acquiescence by the official in the constitutional deprivation.

*Santiago,* 435 F.Supp. at 152.

Therefore, plaintiff fails to carry his burden of proof under the standard articulated by the court in *Santiago.* Accordingly, his Complaint as to defendant Freeholders must be dismissed.

## II. FIRST AMENDMENT CLAIM

Plaintiff was disciplined by suspension for participating in activities which allegedly violated Rules 2, 3, and 4 of the Rules Governing Conduct of Jail Employees (Rules) promulgated pursuant to the provisions of the Camden County Sheriff's Department. Rules 2, 3, and 4 provide:

RULES GOVERNING CONDUCT OF JAIL EMPLOYEES

2. No employee shall make disparaging remarks regarding any other employee or regarding the way affairs of the jail are conducted. Any suggestions for improvement of the jail management or comments regarding the conduct of another employee can be made to Internal Affairs Unit.

3. Employees shall refrain from publicly discussing jail affairs when off duty.

4. All information or publicity relative to the jails shall be given out by the Sheriff's Office only. No employee is authorized to give information to newspaper representatives or any other person without the specific consent of the Sheriff.

Plaintiff alleges that the above Rules are unconstitutional, both on their face and as applied, because they violate his right to free speech as protected by the First Amendment of the United States Constitution. We agree.

The First Amendment guarantees all citizens the right to freedom of speech without governmental interference. This guarantee applies to the states by reason of the Fourteenth Amendment. *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). Therefore, all enactments that regulate speech must be necessary to effectuate a legitimate state interest, and must be narrowly drawn so as not to needlessly interfere with protected First Amendment rights. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1961).

The United States Supreme Court has recognized that the state has a legitimate interest in regulating the speech of public employees. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Indeed, the area of "unregulable speech" available to public employees is narrower than that available to the general public, because "the State has a greater interest in regulating the speech of public employees than in regulating the speech of citizens in general." *Gasparinetti v. Kerr,*

568 F.2d 311, 315 (3d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). The Third Circuit has held that regulations specifically targeted to public law enforcement employees may be promulgated "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." *Id.* at 315–16. Such regulations, however, may only circumscribe a public law enforcement employee's right to speak on matters concerning his employment if they do not encroach on "fundamental personal liberties when the end can be more narrowly achieved." *Shelton,* 364 U.S. at 488, 81 S.Ct. at 252; *Keyishian v. Board of Regents,* 385 U.S. 589, 601, 87 S.Ct. 675, 682, 17 L.Ed.2d 629 (1967); *Gasparinetti,* 568 F.2d at 315.

The issue before this Court, then, is whether Rules 2, 3, and 4 of the Rules Governing Conduct of Jail Employees sweep too broadly in effectuating legitimate governmental interests, thereby unnecessarily interfering with First Amendment rights. We hold that they do.

■ The Rules proscribe dissemination of "all information" by anyone but the Sheriff, and prohibit but do not define "disparaging remarks." The proscription against an employee giving "information" to newspaper representatives or "any other person" without the specific consent of the Sheriff is so overinclusive facially as to leave no room whatsoever for legitimate exercise of free speech in areas of public concern or where virtually no disruption of the Sheriff's Office is conceivable. *Hall v. Pennsauken Twp., Mayor, etc.,* 176 N.J.Super. 229, 422 A.2d 797 (App.Div.1980); *Ramirez v. County of Hudson,* 167 N.J.Super. 435, 400 A.2d 1230 (Ch.Div.1979).

In *Gasparinetti, supra,* the Third Circuit was faced with overbreadth challenges to similar regulations. While recognizing the state's interest in regulating the speech of its public employees, the court in *Gasparinetti* held:

Given the substantial encroachment on the first amendment-protected areas of police officers' speech, the lack of inter-pretive guidance in construing the regulation, the failure to differentiate between criticism of immediate superiors, which might result in disruption, and criticism of remote superiors, where disruption is unlikely, and the public's strong interest in open debate and access to information about its police, we hold that ch. 6:7 is overbroad and therefore unconstitutional on its face.

568 F.2d at 317 (footnotes omitted).

The regulations at issue here suffer from the same constitutional defects as do those invalidated by the court in *Gasparinetti.*

The effect of Rules 2, 3, and 4 is to suppress all speech which publicly criticizes the actions of superior officers. The Rules do not distinguish between speech which directly attacks immediate superiors and deals with interdepartmental matters, and speech which criticizes the actions of remote superiors and relates to matters of public concern. The latter is clearly within the ambit of protected speech, and may not be prohibited. *See Pickering v. Board of Education, supra; Hall v. Pennsauken Twp., Mayor, etc., supra; Ramirez v. County of Hudson, supra.* As the Supreme Court has held, "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibiting effects of overly broad statutes." *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

In weighing the state's interest here in promoting the efficiency of the public services it performs against the protected right of public employees, such as plaintiff, to speak on matters of public concern, the balance in this case tips in favor of plaintiff. The March 19, 1979 letter which precipitated the disciplinary actions against plaintiff dealt with the manner in which the Internal Affairs Unit was handling an investigation within the Sheriff's Office. The matter under investigation had already been made public by Sheriff O'Rourke and the Prosecutor's Office. Plaintiff was not

personally involved in the investigation, and he made no substantive contribution to the preparation of the letter; he merely checked it for spelling and grammatical errors, typed it, and provided a newspaper reporter with a copy. If such activity falls within the definition of "disparaging remarks" or "all information", we find that the Rules are constitutionally infirm and must be struck down.

In addition to being facially overbroad, the Rules are unconstitutional as applied to plaintiff. In *Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216 (3d Cir. 1980), *cert. denied,* 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981), the Third Circuit Court of Appeals set down a three-step analysis for determining when a particular public employee's speech was protected activity within the First Amendment. For plaintiff to prevail in the present action under the *Trotman* test, he must demonstrate: (1) that he engaged in protected activity; (2) that the activity was a substantial or motivating factor in the decision to discipline him; and (3) that defendants were given an opportunity to show that the same actions would have been taken even if the protected activity had not occurred. *Id.* at 224.

■ Plaintiff has satisfied these requirements. The protected activity in which he participated, albeit peripherally, was the publication of the "Carney letter." The "substantial or motivating factor" requirement is satisfied by the stipulation of defendant's counsel at the administrative hearing before the ALJ that the disciplinary actions at issue flowed from his participation in the "Carney letter" incident. Finally, defendant has failed to establish that plaintiff would have been disciplined even if he had not engaged in the protected activity. As the Third Circuit recently stated in a similar case,

> [W]e do not underestimate the internal unease or unpleasantness that may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which s/he believes merits review and reform.

> *That is the price the First Amendment exacts in return for an informed citizenry.*

*Monsanto v. Quinn,* 674 F.2d 990, 1001 (3d Cir.1982) (emphasis added).

For the foregoing reasons, this Court finds that plaintiff's First Amendment rights were violated.

### III. PROCEDURAL DUE PROCESS CLAIM

We turn next to plaintiff's claim that defendant violated his Fourteenth Amendment right to procedural due process.

■ The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law; .... U.S.Const.amend. XIV, § 1. Plaintiff claims that he has a property interest in the powers and indicia of his position as Deputy Warden, and that defendant stripped him of that interest without providing him with the minimum procedural requirements mandated by the Due Process Clause. Defendant argues that plaintiff only has a property interest in continuing employment, and not in the powers and indicia of his position; and that even if plaintiff does have such an interest, his due process rights were not violated because there existed no procedural requirements as a condition precedent to changes in his duties and responsibilities. We find defendant's arguments to be wholly without merit, and, for the reasons set forth below, we find that plaintiff's procedural due process rights were violated.

A colorable property interest is a legitimate claim of entitlement to the benefit about to be deprived, "created and ... defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and ... support [such] claims of entitlement ...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Whether plaintiff here has a cognizable property interest, then, is a question of state law.

**760**

The New Jersey Civil Service Act provides, in pertinent part, that "[n]o officer, clerk or employee holding a position in the competitive class shall be removed, discharged, *fined or reduced*" until he has received notice and an opportunity to be heard, in accordance with set procedures. N.J.Stat.Ann. § 11:22–38 (West 1976) (emphasis added). Plaintiff passed the competitive Civil Service Examination, and rose to the classified rank of Deputy Warden. Therefore, he is not an employee at will, and he has a cognizable property interest.

Defendant argues that because plaintiff was not discharged, he is not entitled to the protection of the Due Process Clause. The Court finds defendant's contention meritless for two reasons. First, the words "fined or reduced" in the above statutory provision evince a legislative intent to accord public employees, such as plaintiff, minimum procedural safeguards when they are disciplined as well as when they are discharged. Moreover, in *Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1974), the Supreme Court held that an Ohio statute permitting public school officials to suspend high school students for ten days for alleged misconduct without fair notice or a hearing violated the Due Process Clause, on the ground that the students had property interests in educational benefits, and liberty interests in maintaining their reputations that could not be taken away without observing the minimum procedures required by the Due Process Clause. Just as the Supreme Court in *Goss* found that plaintiffs had cognizable property and liberty interests even though they were not permanently expelled from school, so too does this Court find that plaintiff has a cognizable property interest in the powers and indicia of his position as Deputy Warden, even though he was not permanently discharged.

Once plaintiff shows that he has a cognizable property interest, the next step in determining whether his right to procedural due process was violated is to establish whether the type of deprivation he suffered falls within the purview of the Due Process Clause.

Plaintiff was continuously subjected to changes in the hours and places of employment, curtailment of his duties and responsibilities as Deputy Warden, suspensions without pay without first being charged with a specific offense, and the untimely filing of charges for alleged past offenses, without notice and without any opportunity to defend his reputation as a public employee or challenge the gradual erosion of his duties and responsibilities. Defendant argues that plaintiff could not have been deprived of due process because "there exists [no] procedural or administrative system for changes in job assignments and the like." Brief in Support of Defendants at 11.

The Court finds defendant's argument unpersuasive. Assuming it is true that no applicable administrative procedures exist, the lack of an adequate system to provide public employees with minimum procedural requirements violates the Due Process Clause just as much as the failure to comply with the terms of an existing system. Moreover, the proper focus when determining if due process requirements apply is not on the existence or non-existence of administrative procedures, but on the nature of the interest at stake. *Goss,* 419 U.S. at 575–76, 95 S.Ct. at 736–37. As the Court in *Goss* held, "as long as a property interest is not *de minimus,* its gravity is irrelevant to the question whether account must be taken of the Due Process Clause." *Id.* at 576, 95 S.Ct. at 737 (citations omitted); *Application of U.S. for an Order Authorizing a Tel. Tracer,* 610 F.2d 1148 (3d Cir.1979).

The Court in *Goss* held that a ten-day suspension from school was not a *de minimus* deprivation, 419 U.S. at 576, 95 S.Ct. at 737, because it potentially threatened "the students' standing with their fellow pupils and their teachers ... [and] ... interfere[d] with later opportunities for higher education and employment." *Id.* at 575, 95 S.Ct. at 736 (footnote omitted). By analogy, defendant's actions here are not *de minimus,* because they unduly interfered with plaintiff's protected interest in his job, and

threatened his reputation as a reliable employee.

The dictates of procedural due process require, at a minimum, fair notice and an opportunity to prepare and respond at a meaningful time. *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). For the foregoing reasons, this Court finds that plaintiff was not accorded the due process protection to which he is entitled.

## IV. SUBSTANTIVE DUE PROCESS CLAIM

We turn now to plaintiff's final argument, namely, that defendant's actions violated his Fifth and Fourteenth Amendment rights to substantive due process, because he was arbitrarily and unreasonably deprived of a protected property interest in the duties and powers of his position as Deputy Warden. For the reasons that follow, we agree.

The substantive due process doctrine proscribes arbitrary or unreasonable governmental interference with life, liberty or property interests, without a rational relationship to a legitimate governmental purpose. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). As the Eighth Circuit has aptly observed, "[t]he concept of substantive due process . . . has had a long and tortured history in the federal courts." *Buhr v. Buffalo Public School District No. 38,* 509 F.2d 1196, 1200 (8th Cir.1974). At the peak of its popularity, it was used by the Supreme Court to strike down state actions "which a majority of the Court deemed unwise." *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 164, 94 S.Ct. 407, 412–13, 38 L.Ed.2d 379 (1973); *see, e.g., Coppage v. Kansas,* 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915); *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). Recent commentary suggests that substantive due process still plays a tacitly significant role in Supreme Court decisionmaking. *See* Tribe,

*Foreword: Toward a Model of Roles in the Due Process of Life & Law,* 87 Harv.L.Rev. 1 (1973); Epstein, *Substantive Due Process by Any Other Name: The Abortion Cases,* 1973 Sup.Ct.Rev. 159; *cf.* Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534 (1974). Nevertheless, the Court itself has expressly repudiated the use of the substantive due process doctrine as a means of interfering with the discretionary authority of state officials. *E.g. North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc., supra; Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *cf. San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Claims of substantive due process violations ordinarily arise in the context of attacks on state legislation which arbitrarily or unreasonably deprives a claimant of a protected interest. The Supreme Court standard of review in such cases is to presume that the legislation is valid unless claimant can show that the aim it seeks to achieve is not a legitimate state interest, or that it is not rationally related to a legitimate state goal. *See, e.g., Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Kelley v. Johnson,* 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

In the case presently before this Court, plaintiff does not allege that he has been deprived of substantive due process by arbitrary or unreasonable state legislation. Instead, he alleges that by curtailing his duties and responsibilities as Deputy Warden, defendant arbitrarily and capriciously forced him into a de facto demotion, without compliance with his procedural rights. Plaintiff contends that defendant offers no rational basis for his actions, and shows no connection to any legitimate state interest in depriving him of the indicia of his position. He contends that these actions violate both state law, which prohibits a public employee from being assigned to duties other than those pertaining to the position he

legally holds, *see* N.J.Stat.Ann. § 11:22–12 (West 1976), and federal law, under the substantive due process guarantees of the Fifth and Fourteenth Amendments.

It has been held that, in the context of public employment cases, "there is no separate, independent 'liberty' interest in being free from arbitrary and capricious governmental action; ... the governmental conduct must deprive the plaintiff of some otherwise recognizable life, liberty or property interest before the plaintiff can recover." *McKnight v. Southeastern Pennsylvania Transp. Auth.*, 438 F.Supp. 813, 826 (E.D.Pa.), *vacated and remanded on other grounds*, 583 F.2d 1229 (3d Cir.1978). Plaintiff here satisfies this threshold requirement, because in our earlier discussion of his procedural due process claim, we found that he had established a cognizable property interest in his position as Deputy Warden. Therefore, the appropriate test to be applied here is whether defendant's actions, under color of state law, arbitrarily and capriciously infringed on plaintiff's protected interest in a way that was not rationally related to the attainment of legitimate governmental objectives. *See McKnight*, 438 F.Supp. at 826–27; *United States Ex Rel. Hoss v. Cuyler*, 452 F.Supp. 256, 281 n. 9 (E.D.Pa.1978); *Calhoun v. Doster*, 324 F.Supp. 736, 743 (M.D.Ala.1971).

■ The evidence adduced at trial established that since his candidacy for election as Sheriff of Camden County in 1976 and again in 1979, plaintiff was subjected to constant shift changes, transfers, undesirable shift assignments, an unsatisfactory performance rating after years of commended service, and severe curtailment of his duties as Deputy Warden. It was also established that the Civil Service Commission desk audit, conducted on April 20, 1979, concluded that he was effectively demoted to a lower level job without compliance with his procedural rights under N.J.Stat. Ann. § 11:22–12, *supra*. Although defendant was directed by the Commission's report to either assign to plaintiff the duties commensurate with his position as Deputy Warden, or to initiate formal demotion proceedings pursuant to N.J.Admin. Code tit. 4 § 4:1–16–4(a) (1982), defendant's response, according to his own testimony, was that plaintiff did not understand the parameters of his job, and that he would have to be "reinstructed." (Tr. 162–63). The record does not establish whether plaintiff was in fact so "reinstructed."

Defendant O'Rourke's testimony offers no explanation which plausibly places his conduct within the range of legitimate governmental action; indeed, he baldly asserts that plaintiff was *granted* perquisites of office, not deprived of them. The evidence, however, suggests otherwise. The cumulative incidents of harassment, abuse, and reprisal established at trial sustain a finding by this Court that defendant did in fact deprive plaintiff of the powers and indicia of his position as Deputy Warden, in violation of his constitutional right to substantive due process. *See Calhoun, supra,* 324 F.Supp. 736. Moreover, it may reasonably be inferred that the political differences of the parties in this action, and their opposing candidacies for election to the office of Sheriff, were each a proximate cause of the defendant's discrimination against the plaintiff.

## V. CONCLUSION

For the reasons heretofore indicated, the Court finds that plaintiff has not met his burden of proof as to defendants Joseph Borreggine, Eugene Feldman, Michael J. Hayes, Joseph J. Milano, Hillard T. Moore, Sr., Edward W. Sayers, and William Simon, individually and in their capacities as members of the Camden County Board of Chosen Freeholders, and they will be dismissed as party defendants in this action. As to defendant Sheriff O'Rourke, however, this Court finds that he has violated plaintiff's right to freedom of speech under the First Amendment to the Constitution, and his rights to procedural and substantive due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. Judgment shall be entered in favor of plaintiff and against defendant O'Rourke.

Federal courts have the discretionary authority to use any available remedy to redress the violation of federally secured rights under § 1983. *Donahue v. Staunton,* 471 F.2d 475 (7th Cir.1972), *cert. denied,* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973). Accordingly, a preliminary and permanent injunction shall be issued restraining defendant and his agents, employees and successors from continuing the pattern and practice of harassment against plaintiff. In addition, keeping in mind that "the basic purpose of a § 1983 damage award [is] to compensate persons for injuries caused by the deprivation of constitutional rights …", *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978), plaintiff shall also be awarded compensatory damages for sixty-five days of back pay at Eighty Dollars ($80.00) per day for a total of Five Thousand, Two Hundred Dollars ($5,200.00) (Stipulated Fact, Final Pretrial Order January 23, 1981); for six days of sick leave, with a value of Four Hundred and Eighty Dollars ($480.00) (Stipulated Fact, Final Pretrial Order January 23, 1981), for retirement contributions based on Five Thousand, Two Hundred Dollars ($5,200.00) of income for sixty-five days' work (Stipulated Fact, Final Pretrial Order January 23, 1981), in an amount to be submitted to this Court by plaintiff, and a total of Fifteen Thousand Dollars ($15,000.00) for the humiliation, hurt feelings, and embarrassment plaintiff suffered, which manifested themselves in lost sleep, lost appetite, and social dysfunction. In addition, plaintiff shall also be awarded attorney's fees pursuant to 42 U.S.C. § 1988, and costs of suit.

Counsel for plaintiff shall submit an appropriate order.